**Claude BALDWIN, Petitioner,**

**v.**

**Dr. Bart KNIGHT and Dr. Lee Myers, Respondents.**

Supreme Court of Tennessee.

Aug. 7, 1978.

R. Jerome Shepherd, Colloms, Banks & Shepherd, Cleveland, for petitioner.

William C. Carriger, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, Mayo L. Mashburn, Eddie L. Headrick, Bell, Painter, McMurray, Callaway, Brown & Mashburn, Cleveland, for respondents.

## OPINION

FONES, Justice.

This is a medical malpractice case. In directing a verdict in favor of both doctors at the close of the plaintiff's proof, the trial judge held that (1) the formal statement of the Medical Malpractice Review Board (MMRB) was admissible under T.C.A. § 23–3409, but that it could not be used to provide the expert testimony required by T.C.A. § 23–3414(b) to support the three elements of a plaintiff's prima facie case required by paragraph (a) of that section; and (2) that the testimony of the three doctors called by the plaintiff failed to establish the elements of a malpractice case as required by T.C.A. § 23–3414(a). The Court of Appeals affirmed.

We granted certiorari and we are of the opinion that the plaintiff's proof established a prima facie case and that error was committed in granting a directed verdict.

On September 18, 1975, plaintiff, 79-year-old Claude Baldwin, was struck in the calf of his right leg by a piece of wire which had been run over by the lawnmower he was using. Plaintiff was taken to the emergency room of Bradley Memorial Hospital, where he was initially interviewed by a nurse, who wrote on the admitting form that "[t]he patient has a puncture type wound obtained when mowing grass from a broken bottle." Plaintiff was then examined by defendant Dr. Bart Knight, who read the history taken by the nurse, diagnosed the wound as a simple three-quarter-inch laceration, cleaned it, and sutured it. Doctor Knight then released plaintiff, telling him to stay off the leg, keep it clean and dry, and to return to the emergency room or to his private physician if he had problems. Doctor Knight did not x-ray the wound.

The next day, plaintiff returned to the emergency room complaining about the pain in his leg. On this occasion, he was examined by Dr. Lee Myers, who diagnosed plaintiff's condition as cellulitis, prescribed various home treatments for this condition, and released plaintiff. Doctor Myers did not x-ray the wound.

On September 21, plaintiff returned to the emergency room again, and was seen by his personal physician, Dr. Jack Free. Doctor Free x-rayed the wound and discovered a piece of wire slightly over one inch long inside, which he removed.

Plaintiff sued Drs. Knight and Myers, alleging damages resulting from their failure to x-ray his wound, and the claim was referred to the MMRB in accordance with T.C.A. § 23–3403. After a hearing, the MMRB found the claim against Dr. Myers to be without merit; it found the claim against Dr. Knight to be with merit, and made the following formal statement required by T.C.A. § 23–3409:

"The standard of care deemed applicable by the Board is that (1) the physician should obtain a history of how the wound occurred, (2) the physician should inspect the wound, and (3) if the probability of a foreign body exists as being determined from either the history and/or inspection of the wound, appropriate x-rays should be taken.

"CONCLUSION: In the Board's opinion, a proper history was not obtained and with a proper history under the standard of care in this community the Board feels x-rays should have been obtained."

The parties did not settle the claims, and plaintiff proceeded to trial against both doctors.

Plaintiff's assignments of error raise these questions: (1) can the formal statement of the MMRB be used as a substitute for expert testimony; (2) what use, if any, can be made of the formal statement of the MMRB in the examination or cross-examination of experts; and (3) did the Court of Appeals err in sustaining the trial judge's decree directing a verdict for defendants at the conclusion of plaintiff's proof.

### I.

This Court is confronted, for the first time, with a Legislatively mandated rule of evidence directing the admissibility of the formal statement of the MMRBs, "as an exception to the hearsay rule." The statute provides as follows:

23–3409. *Hearing — Reports — Board members barred from trial—Liability of board.*—The hearing shall be informal and without a stenographic record. No statement nor any expression of opinion made in the course of the hearing shall be admissible in evidence either as an admission or otherwise in any trial of the action. The board shall prepare a formal statement of its recommendations. If a minority number of the board members do not agree with the statement and recommendations of the majority, a minority statement may be prepared which shall be identified as such.

The formal statement of the board and the minority statement, if any, shall be admissible at a subsequent trial as an exception to the hearsay rule. The formal statement of recommendations of the board or the minority statement shall include, but not be limited to, (1) the standard of conduct applied; (2) the alleged deviation from such standard; and (3) findings and conclusions.

No board member shall participate in the trial either as counsel or witness. Board members shall be immune from civil suit as a result of actions or omissions committed pursuant to duties described in the chapter. Sections 4–507—4–527 shall not apply to the board established by this chapter or the proceedings thereof. [Acts 1975, ch. 299, § 9; 1976 (Adj.S.), ch. 759, § 10.]

This statute marks a radical departure from the rules of evidence applicable to all other types of cases. It dispenses with the traditional right of cross-examination and confrontation. It is likely to be of greater benefit to defendants, when favorable to them, than to plaintiffs, when favorable to that class of litigants, creating a possible imbalance between classes of litigants.

■ However, we are not authorized to strike down the statute because we consider it unwise or inequitable, only if it violates constitutional requirements or deprives any person of his constitutional rights. See *State v. Yardley*, 95 Tenn. 546, 565, 32 S.W. 481 (1895); 29 Am.Jur.2d *Evidence* § 44 (1967). No party to this litigation questions the admissibility of the MMRB's formal statement offered as evidence in this case.

■ However, plaintiff has insisted at all stages of this litigation that the MMRB's statement should be accepted as evidence establishing a prima facie case against defendant Knight, because it was a unanimous decision, two members of the Board were physicians, and the statement embraces the elements of proof required of a plaintiff by T.C.A. § 23–3414(a).

We think the answer to that contention is to be found by considering T.C.A. § 23–3414 *in pari materia* with T.C.A. § 23–3409, in light of the avowed legislative purpose in establishing MMRB, to wit, "to facilitate the disposition of all medical malpractice actions." T.C.A. § 23–3403(a).

T.C.A. § 23–3414 provides as follows:
23–3414. *Claimant's burden—Expert testimony—Presumption of negligence—Jury instructions.*—(a) In a malpractice

action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

(c) In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant. Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

(d) In a malpractice action as described in subsection (a) of this section, the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence. [Acts 1975, ch. 299, § 14; 1976 (Adj.S.), ch. 759, § 15.]

It is readily apparent that the foregoing section of the Act, in paragraph (a), briefly states the requirements of existing case law governing the plaintiff's burden of proof in a medical malpractice action and adds, in paragraph (b) to the present case law requirements relating to expert testimony, (1) the necessity that a medical expert be licensed in this state or a contiguous bordering state; (2) the relevant specialty requirement; and (3) judicial discretion to waive those requirements upon a showing of the unavailability of such witnesses.

We think the conclusion is inevitable that the Legislature has sanctioned existing case law governing both substantive and evidentiary requirements, merely adding thereto the admissibility of the Board's decision and the additional expert witness requirements. It is apparent that the legislative purpose in directing the admission of the formal statements of MMRBs was to encourage settlements, and not for use as an evidentiary substitute for expert testimony, as required by case law, augmented by T.C.A. § 23–3414(b).

## II.

██ We see no reason why the expert witnesses who testify at trial may not be examined or cross-examined to determine if they agree or disagree with the recommendations contained in the formal statement of the MMRB, with appropriate questioning to elicit the specifics of any disagreement. The admissibility of a review board's statement having been legislatively enacted, as an exception to the hearsay rule, the jury has the recommendation of the board before it, not as a substitute for the proof required to sustain or defend a malpractice action, but to be given such weight, credit and value as the jury may ultimately determine. Such use of the formal statement at trial should assist the jury in determining

the probative value, if any, to assign to the board's recommendation.

■ We think it appropriate to observe, in view of incidents that occurred at the trial of this case, that the second sentence of T.C.A. § 23–3409 excludes from admissibility at the trial any attempt to bring to the attention of the jury what evidence was or was not adduced at the board hearing. In short, nothing about the MMRB hearing, beyond the language of the formal statement, is admissible at trial.

### III.

■ The two lower courts concentrated their analysis of plaintiff's proof upon the testimony of Dr. Free. We will not review it in detail, because in our view, a correct resolution of the issue before us turns upon the facts and the expert testimony of the two defendant doctors, both of whom were called as adverse witnesses by the plaintiff. Suffice it to say that Dr. Free, who had practiced medicine in Bradley County for twenty years, steadfastly maintained under examination by plaintiff's counsel that he did not know the standard of care in that community, but also said he did know, "what is proper medical treatment in this area." He said that he would have x-rayed plaintiff on the occasion of his first visit to the hospital, but that the "standard of care in the community" did not require an x-ray. In short, his testimony is subject to the same observation made by Mr. Justice Gailor, in *Mullendore v. State*, 183 Tenn. 53, 191 S.W.2d 149 (1945), with respect to the testimony of a psychiatrist:

"The attitude of obvious partisanship displayed by this nominally expert witness, furnishes convincing evidence of the wisdom of the rule laid down by this Court, that expert testimony is to be received 'with great caution;' (*Fisher v. Travelers Insurance Co.*, 124 Tenn. 450, 505, 138 S.W. 316, 330, Ann.Cas. 1912D, 1246; *Wilcox v. State*, 94 Tenn. 106, 28 S.W. 312) . . . ." 191 S.W.2d at 152.

Plaintiff called Dr. Myers as an adverse witness and he testified, in part, as follows:

Q. All right, now Dr. Myers, the standard of care in the Bradley County area is that physicians should obtain the history of how the wound occurred. Isn't that part of the standard of care?

A. Yes.

Q. And, the second standard of care is that the physician should inspect the wound. Isn't that part of it?

A. Yes.

Q. Third, is that if the possibility of a foreign body exists, as being determined either from the history, or inspection of the wound, an appropriate x-ray should be taken. Isn't that part of the standard of care?

A. Yes.

Q. All right. And, also, part of the standard of care is, if you see the patient—on the first time you see him, and you suture him up and he later comes back with complications, then you re-evaluate the patient. Isn't that correct?

A. Yes.

Q. And, then you take more information, do you not, sir?

A. If it's available, yes.

Thus, Dr. Myers' testimony established the standard of care in Bradley County applicable to the facts of this case.

Doctor Free's deposition established that plaintiff's healing process was delayed and the pain period prolonged by the failure to discover the wire on plaintiff's earlier visits to the hospital, when he was seen first by Dr. Knight and then by Dr. Myers. That testimony established that the plaintiff suffered injury, proximately caused by the failure to discover the wire.

Thus, it follows that if the failure to discover the wire resulted from defendants' lack of reasonable and ordinary care in obtaining the history of the injury or inspecting the wound, plaintiff has established a prima facie case of malpractice against defendants.

The focus of our inquiry is reduced to (1) has plaintiff adduced evidence that defend-

ants did not act with reasonable and ordinary care in obtaining the history of the injury, which would have revealed that the wound was caused by a flying object, with the probability that a foreign body remained imbedded therein; and (2) was expert testimony necessary to characterize their actions, or failure to act, as negligent?

It is significant to observe at this point that the standard of care required that appropriate x-rays be taken if the history of how the wound occurred indicates the probability of a foreign body.

Plaintiff's wound was located in the calf of the right leg. He was wearing rubber boots, the tops of which were just below the knee, and the flying object went through his boot near the top, into the large muscle of the lower leg. Doctor Knight denied seeing the boots, but the location of the wound incurred while operating a lawn mower is in and of itself circumstantial evidence that a flying object was involved, and that probability is clearly in the realm of the common observation of men of ordinary experience and affairs, requiring no scientific or medical expertise to perceive.

The nurse at the hospital saw plaintiff before he was seen by Dr. Knight. She wrote on the admitting form that "[t]he patient has a puncture type wound obtained when mowing grass from a broken bottle." Doctor Knight admitted that he saw that entry. He testified that "[i]f there is any indication of a flying object that I can elicit in the history, my normal procedure is to x-ray it."

Doctor Knight's responses to questions relating to the significance of the nurse's entry follow:

A. I did read the history the nurse takes.

Q. You just overlooked it?

A. No, sir, I did not overlook it. This is a descriptive term used by a nurse. I don't have nurses diagnose for me. I do my own diagnosis. Now, in my evaluation of the patient, and in my history, I had nothing to indicate that there was any flying object that had anything to do with this laceration.

Q. Well, you had this did you not, Doctor?

A. Yes, and it says that he cut his leg on broken glass while he was mowing grass.

Q. It says, Doctor, "The patient has a puncture type wound obtained from mowing grass from a broken bottle." Now, doesn't that tell you that the mower hit the broken glass and threw the glass back in his leg?

A. No, sir.

Q. Now, you—

A. I want to make it very clear—that is the place on each emergency room slip where nurses put the history the patient gives them and their findings. Nurses do not—and they are very carefully instructed not to make a diagnosis. This is not a diagnosis. This is a nurse's impression and whatever she was told. The doctor makes his diagnosis. My diagnosis in my writing is on the line that says diagnosis, and I say that in my professional opinion it was a three-quarter-inch laceration of the right leg.

The nurse's one-sentence history, although grammatically incorrect, was sufficient, in our opinion, to put anyone who has a reasonable understanding of the English language on notice that a flying object may have been impelled into plaintiff's leg and that a foreign body might still be imbedded therein. No medical expertise is called for in reaching that deduction.

It appears that the experts concede that most glass shows on x-ray because it contains lead. The fact that the nurse's entry mentioned glass as the probable flying object was not asserted by the experts as detracting from its significance.

Doctor Knight testified later that plaintiff gave him a "misleading or inaccurate" history. No attempt was made to state what Dr. Knight asked plaintiff or plaintiff's response, and the bare statement that plaintiff gave a misleading or inaccurate history is a conclusion entitled to no probative value. At the very least, Dr. Knight was put on notice that the history should be clarified, and there is no evidence that he

attempted to further explore the probability of a flying object as the cause of the wound.

When Dr. Myers saw plaintiff, the nurse's history and the location of the wound were available and known to him. Whatever reliance he was entitled to place upon Dr. Knight's having ascertained the presence or absence of a foreign body in the wound was offset by the complications that had developed, which he admitted called for re-evaluation, and plaintiff testified that when Dr. Myers was inspecting and pressing on the wound, plaintiff said, "Whoa, hold on there, Doc, there's something in there sticking me."

There is an analogy between this case and *Haskins v. Howard*, 159 Tenn. 86, 16 S.W.2d 20 (1929). Doctor Haskins operated on plaintiff for the purpose of removing an ovarian tumor, discovered that she was three and one half months pregnant, terminated the operation, and closed the incision. Plaintiff miscarried fifteen days later. Doctor Haskins testified that he would not have operated on plaintiff if he had known she was pregnant; that he was "apprehensive" of pregnancy at the time he operated and that plaintiff was in no danger of death if the operation had been delayed. He said that he was induced to operate at the time he did because plaintiff was suffering. Expert testimony was presented to the effect that the standard of care prohibited an operation on a pregnant woman, because of the fear of miscarriage, unless it was absolutely necessary, her life being in danger. The Supreme Court held that although plaintiff presented no expert testimony as to what other physicians would have done in the circumstances proven, entertaining an apprehension of pregnancy, "we think the jury, as men of ordinary experience and affairs, were qualified to draw their own inferences, and to reach their own conclusion as to what course other physicians of requisite skill and ability would have taken, without the aid of the testimony of experts." 159 Tenn. at 96, 16 S.W.2d at 23.

Where the act of alleged malpractice lies within the common knowledge of a layman, expert testimony is not required.

*Bowman v. Henard*, 547 S.W.2d 527 (Tenn. 1977); *Rural Educ. Ass'n. v. Bush*, 42 Tenn. App. 34, 298 S.W.2d 761 (1956). See also *Vaughn v. Shelton*, 514 S.W.2d 870 (Tenn. App.1974) where it was held that expert medical evidence was not required to prove that if both of the fallopian tubes are severed and closed, the patient would thereby be rendered immune from pregnancy.

*Floyd v. Walls*, 26 Tenn.App. 151, 168 S.W.2d 602 (1942); and *Gresham v. Ford*, 192 Tenn. 310, 241 S.W.2d 408 (1951), are relied upon by defendants as requiring expert testimony to determine whether or not a doctor's decision not to x-ray constitutes malpractice. Those cases are inapposite for the reason that this case does not involve the alleged negligent act of failure to x-ray. The alleged negligent act here was the failure to ascertain, from history and inspection, that the wound was caused by a flying object and possibly contained a foreign body. All the experts agreed that if the true facts had been ascertained, x-rays were indicated and would have been taken.

Reversed and remanded for a new trial. Costs are adjudged against defendants.

HENRY, C. J., COOPER and HARBISON, JJ., and DAVIS, Special Justice, concur.