James W. RUNNELLS, Petitioner,

v.

Gaylon R. ROGERS, Respondent.

Supreme Court of Tennessee.

Feb. 19, 1980.

Petition to Rehear Overruled
March 31, 1980.

Jack Green, Nashville, for petitioner.

John E. Brandon, Watkins, McGugin, McNeilly & Rowan, Nashville, for respondent.

## OPINION

HENRY, Justice.

In this medical malpractice action the sole question is the necessity for expert medical testimony.

On the trial, the jury awarded plaintiff the sum of $1,224.48. The Court of Appeals reversed and dismissed, holding that such testimony was required.

### I.

#### Factual Background

The basic facts are not in dispute. On April 14, 1976, petitioner, while operating this power lawnmower, ran over a piece of wire throwing it into his foot, resulting in a puncture wound, with the wire being imbedded in the foot. He went immediately to the Baptist Hospital where he was seen by the respondent, Dr. Rogers. Dr. Rogers examined the foot, took X-rays, and made an unsuccessful effort to remove the imbedded bit of wire. He gave petitioner some capsules for infection and told him to go home, stay off his feet and come back the following Friday, two days later. No effort was made after this initial consultation to remove the wire.

Petitioner returned on Friday. Dr. Rogers again examined the foot, redressed the wound, told him to continue on antibiotics and told him to return the following Monday. On Monday, April 19, 1976, petitioner reported for work but his foot was in such pain that he was unable to perform his duties. By that time his foot had swollen and was turning red. He was unable to get his shoe on. That same day he went back to the hospital, where he saw another doctor in the absence of Dr. Rogers. He gave him some antibiotics and told him to return to see Dr. Rogers on Wednesday.

On April 21, 1976, he returned to Dr. Rogers, who examined his foot and removed the stitches. By this time his foot was turning a dark color. The doctor prescribed more antibiotics, told him to stay off that week and to return to work on Monday.

On April 26, 1976, after working two days on light duty, petitioner went back to Dr. Rogers. By this time he was walking with difficulty, his foot had turned blue, and it was "running" or oozing some sort of liquid substance. Dr. Rogers examined him, told him to soak his foot, stay off it and return the following Monday. He continued on antibiotics.

On Monday, April 29, 1976, petitioner again tried to return to work and was able to work some that week; however, his foot was black and swollen, still running and he continued to be unable to get a shoe on it.

On May 5, 1976, he again saw Dr. Rogers who examined him, told him to take antibiotics, soak his foot and go back to work the following week. He tried to return to work but by this time his foot "was so sore I couldn't hardly walk." It was still black and running and he could not wear a shoe.

Following each visit and at all times petitioner relied upon Dr. Rogers and followed his advice and instructions. Finally, on May 10, 1976, he consulted Dr. John C. Brothers, who X-rayed and dressed the foot, gave him a "larger" prescription for antibiotics and made an appointment for the following Monday.

On May 16, 1976, Dr. Brothers put him in West Side Hospital, reduced the infection and surgically removed the wire. After a four-day hospital stay he was released and gradually recovered.

The plaintiff did not call an expert medical witness.

This suit was filed on September 23, 1976, against Dr. Rogers and the Baptist Hospital. At the conclusion of all the proof, the Trial Judge sustained a motion for a directed verdict as to the hospital.

## II.

### *The Formal Statement of the Medical Malpractice Review Board*

Pursuant to Section 23–3403(b), T.C.A., this action was referred to the Medical Malpractice Review Board. After holding its hearing, the Board, acting pursuant to Section 23–3409, T.C.A., prepared and submitted a formal statement of its recommendations. This Code section provides, in pertinent part:

The formal statement of the board . . shall be admissible at a subsequent trial as an exception to the hearsay rule.

We noted in *Baldwin v. Knight*, 569 S.W.2d 450 (1978), that this statute was a legislatively mandated exception to the hearsay evidence rule. The formal statement was entered in evidence. The Board set forth the required standard of care and noted deviations as follows:

1. Failure to engage a consultant.
2. Engaging in care of non-emergency patient on an ongoing basis.[1]

In its finding the Board held that Dr. Rogers "did not conform to reasonable standards as would be expected of an emergency room physician in that he failed after several visits to recommend appropriate consultation. . . ." We view this as tantamount to a finding that the doctor attempted to practice in an area which exceeded his professional competence, which is a form of negligence.

We held in *Baldwin, supra*, that the legislative purpose in providing for the admission of the formal statement of the Review Board "was to encourage settlements, and not for use as an evidentiary substitute for expert testimony . . .." 569 S.W.2d at 453. However, we further held that:

the jury has the recommendation of the board before it, not as a substitute for the proof required to sustain or defend a malpractice action, but to be *given such weight, credit and value as the jury may ultimately determine.* (Emphasis supplied). 569 S.W.2d at 453.

 Thus the formal statement was properly before the jury and it was entitled to consider it and was the sole judge of its weight, credit and value. This, however, standing alone, does not satisfy the traditional requirement that expert testimony is mandatory in malpractice actions, unless the alleged acts of malpractice lie within the common knowledge of laymen. *Bowman v. Henard*, 547 S.W.2d 527 (1978).

## III.

### *The Necessity for Expert Testimony*

 The requirement for expert testimony and the "common knowledge" exception thereto are firmly entrenched in our law. The difficulty arises when an effort is made to apply the rules to a given set of facts in a case wherein the application of the exception is fairly debatable. This is such a case.

 In the totality of the circumstances, however, we perceive this to be a proper case for the application of the common knowledge exception. It is evident from reading and studying this record that this wire imbedded in plaintiff's foot should have been removed. We held in *Baldwin*,

1. This finding has no relevance.

*supra*, that the negligent failure of a physician to discover a ·piece of wire lodged in the plaintiff's foot by a lawnmower was within the knowledge of a layman. We see no difference in principle between a failure to discover on the one hand and a failure to treat properly after discovery on the other.

It is within the common knowledge of laymen that where a patient is injured by a piece of wire imbedded in his foot, the foot has swollen to the point that the shoe may not be worn, the patient has difficulty in walking, there is soreness resulting from probing in an unsuccessful effort to remove it, and the foot is oozing and running, then the wire must be removed. These facts must be considered in the light of the action of Dr. Brothers in reducing the infection and removing the wire.

Even a barefoot boy knows that when his foot is infested by a sticker, splinter, thorn, pin or other· foreign object, it must be removed. Most assuredly this lies within the ken of a layman.

Dr. Rogers apparently thought so. He tried to remove it and upon failure merely treated Runnells with antibiotics, resting and soaking, during all of which time the patient grew steadily worse.

 The fact that Dr. Brothers removed the wire and the patient promptly healed would lead an average layman to conclude that this was the proper practice and failure to do so was a deviation. Medical testimony could hardly have made the case stronger. Moreover, the jury was entitled to give "weight, credit' and value" to the Review Board's finding that the patient should have been referred to a consultant. An inevitable corollary is that Dr. Rogers was negligent in practicing beyond his expertise.

As this Court observed in *Haskins v. Howard*, 159 Tenn. 86, 16 S.W.2d 20 (1929):

> [W]e think the jury, as men of ordinary experience and affairs, were qualified to draw their own inferences, and to reach their own conclusion as to what course other physicians of requisite skill and ability would have taken, without the aid of the testimony of experts.

159 Tenn. at 96, 16 S.W.2d at 23.

 There is an additional matter we find troubling. This is the fact that in the face of a prima facie case of negligence, the doctor declined to testify and failed to call witnesses. We fully recognize the general rule that a defendant in a civil case is not required to testify and has the right to rely upon the duty of the plaintiff to carry the burden of proof and to avail himself of the plaintiff's failure to make out a case.

There is, however, another rule of law that we think applicable in this case. The Trial Judge charged the substance of the missing witness rule to indicate the unfavorable inferences arising from the unexplained failure of the defendant to produce evidence within his knowledge and control.

Mr. Justice Lansden, in *Western Union Telegraph Co. v. Lamb*, 140 Tenn. 107, 203. S.W. 752 (1918), articulated the rule, as applied to the failure of a party defendant to testify, as follows:

> [W]here the evidence tends to fix liability on the defendant, and if he has it in his power to offer evidence to rebut the unfavorable inferences which the proof tends to establish, and neglects or refuses to offer such proof, it may be inferred from the facts shown that the fully developed evidence would establish liability upon his part.

140 Tenn. at 111, 203 S.W. at 753.

 This rule applies, however, only "when the plaintiff's proof and the legal deduction therefrom make a *prima facie* case against the defendant." *Davis v. Newsome Auto Tire and Vulcanizing Co.*, 141 Tenn. 527, 529, 213 S.W. 914, 915 (1919). *See also, Dukes v. McGimsey*, 500 S.W.2d 448, 451 (Tenn.App.1973).

 We think this is such a case. Given the nature of the injuries, the successful treatment by another doctor, the findings of the Review Board and the action of the Trial Judge in submitting the case to a jury after overruling a motion for a directed verdict, as an absolute minimum this was a *prima facie* case, with the evidence tending

to fix liability. Dr. Rogers had full knowledge of the injury and its treatment. Remaining silent was his privilege, but it was the jury's privilege to draw an unfavorable inference from his failure to testify. And it is ours.

We invoke this rule only in a case wherein plaintiff makes out a *prima facie* case based upon evidence tending to fix liability and then, only in aid of the proposition that these were matters within the knowledge of the ordinary lay person. We stand foursquare behind *Bowman v. Henard, supra,* and the general rule requiring medical testimony.

### IV.

#### Issues Presented by Respondent

Respondent, pursuant to Rule 27(a), Tenn.R.App.P., designated issues. Most of these fairly inhere in the foregoing discussion.

We hold that all special requests tendered were either covered in the main charge, or have no evidentiary basis or the failure of their inclusion had no effect on the jury verdict.

■ Respondent complains of the action of the Trial Judge in manually delivering the written charge to the jury over the objection of counsel and asserts that this was error as a matter of law. We are cited to Section 20–1315, T.C.A. This Code section merely requires that the charge in civil cases be reduced to writing, at the request of either party, before delivery to the jury. We are also cited to *Smith v. Steele*, 313 S.W.2d 495 (Tenn.App.1956). This case merely holds that the trial judge is not required to physically deliver the written charge to the jury. We know of no authority precluding the practice of physically delivering to the jury the trial judge's charge, after oral delivery. This is a matter lying wholly within the discretion of the trial judge.

■ Respondent charges the trial court with error in disclosing the *ad damnum* to the jury. Section 23–3416, T.C.A., provides that in medical malpractice actions the complaint may state a demand for a specific sum but that this shall not be disclosed to the jury. Assuming, but not deciding, the validity of this portion of the law, the error, if any, was harmless beyond doubt. Plaintiff sued for $25,000.00; he was awarded $1,224.48. This complaint is frivolous.

The issues designated by respondent are without merit.

Reversed.

BROCK, C. J., and FONES, J., concur.

HARBISON and COOPER, JJ., dissent.

HARBISON, Justice, dissenting.

I respectfully dissent from the majority opinion, particularly insofar as it holds that there was no necessity for expert testimony in the present case. While the majority find it "troubling" that the defendant doctor failed to testify, I find it much more troubling that the plaintiff did not call the defendant doctor as an adverse witness, which he could have done under the Rules of Civil Procedure without in any way making the defendant the plaintiff's witness or vouching for his credibility. *See* Rule 43.02. Possibly even more puzzling and affording some basis for an inference against the plaintiff was his failure to call either Dr. Brothers or Dr. Peters, both of whom had seen the patient and one of whom had actually removed the foreign body.

I am unable to concur in the majority's "barefoot boy" philosophy concerning foreign objects. It is a known fact that thousands of veterans of World War I and World War II have lived for years with fragments of shrapnel and other foreign objects in arms, legs, and other portions of the anatomy because of medical judgment that removal would be ill-advised or detrimental. Andrew Jackson was shot in a duel in 1806. The ball was embedded in the rib cage near the heart, and it remained there until Jackson's death in 1845—some thirty-nine years later. Although the wound was troubling to Jackson on frequent occasions, it was the medical judgment of surgeons of that day that removal could not be safely accomplished.

While that case is hardly analogous to the facts presented here, nevertheless it is my opinion that whether and when removal should have been attempted in the present case were clearly questions for expert evaluation and judgment and were not decisions for determination by lay persons. I do not consider *Baldwin v. Knight*, Tenn., 569 S.W.2d 450 (1978), to be controlling here, and it seems to me, contrary to the statement in the majority opinion, that there is a vast difference between the failure of a physician to discover a foreign body for lack of a proper history on the one hand and his professional judgment as to whether or when to remove it on the other.

Even a casual glance at medical literature will demonstrate the foregoing. For example, in a discussion of injuries to the hand found in a treatise on traumatic medicine, the following statement is made:

"Complications following removal of a foreign body may well be precipitated by ill-advised attempts at removal in the first place. Small inert foreign bodies such as BB shot are frequently better left alone since the exploration for their removal may entail considerable dissection amongst vital anatomical structures. . .

"The secondary removal of foreign bodies has all the problems inherent in the removal at the time of injury. It is also often made more difficult because the track of injury can no longer be located and because considerable scar tissue surrounds the foreign body. An ever-present and severe risk is that the surgery may 'light up' a tetanus infection from bacteria introduced at the time of the original injury. Appropriate precautions must always be taken before such surgery is undertaken." 2 *Traumatic Medicine and Surgery for the Attorney*, 182–83 (P.D. Cantor ed. 1960).

While the foregoing discussion pertains to a hand injury, an examination of any medical or surgical textbook will reveal that the anatomy and structure of the foot are also extremely complex. *See e. g., Legal Anatomy and Surgery*, 309–19 (2d ed. B.S. Maloy 1955). Without detailed medical testimony as to the location of a foreign body, its size

and relation to surrounding tissues, muscles and bones, in my opinion, it would be sheer guesswork on the part of lay persons to know whether surgical removal of a foreign object should be attempted and at what point in the course of treatment such attempt should be made. Apparently in the present case Dr. Rogers at first attempted removal but later felt that another and different course of treatment was advisable.

Statutes governing medical malpractice actions now require that expert testimony be used to establish the appropriate standard of care in the first place and its violation in the second place. The instances in which these requirements need not be met are few indeed. In my opinion the present case is not such an exception.

I would affirm the judgment of the Court of Appeals.

COOPER, J., concurs in this dissent.

### MEMORANDUM ON PETITION TO REHEAR

HENRY, Justice.

The Petition to Rehear is respectfully overruled.

All members of the Court adhere to their original positions.