DONALD EUGENE HARRIS,          )
                               )
          Plaintiff/Appellant, )          Appeal No.
                               )          01-A-01-9801-CV-00041
v.                             )
                               )          Davidson Circuit
GLENN S. BUCKSPAN, M.D.,        )          No.  95C-1489
individually and               )
GLENN S. BUCKSPAN, M.D.,P.C. )
                               )
          Defendant/Appellee.  )
                               )

FILED

August 19, 1998

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE BARBARA N. HAYNES, JUDGE

LARRY D. ASHWORTH
227 Second Avenue, North
Nashville, Tennessee  37201

PETER D. HEIL
P. O. Box 40651
Nashville, Tennessee  37204
          ATTORNEYS FOR PLAINTIFF/APPELLANT

C. J. GIDEON, JR.
JOE W. ELLIS, II
NationsBank Plaza, Suite 1900
414 Union Street
Nashville, Tennessee  37219-1782
          ATTORNEYS FOR DEFENDANT/APPELLEE

AFFIRMED

WILLIAM B. CAIN, JUDGE

OPINION

I.    FACTS

This is a medical malpractice action in which the plaintiff appeals from a directed verdict in favor of the defendant.

Plaintiff, Donald Gene Harris, is a professional wrestler and presented himself on January 25, 1993 to the defendant, Dr. Glenn S. Buckspan, for an evaluation of bilateral gynecomastia or breast enlargement. After discussing various surgical options, Dr. Buckspan referred Plaintiff to Dr. Craig Sussman for endocrinology study and possible non-surgical management of Plaintiff's enlarged breast condition.

Dr. Buckspan's clinical note for this January 25, 1993 visit was admitted in evidence and reveals the following:

> Is seen in consultation with bilateral gynecomastia. [Mr. Harris] does have a past history of having used anabolic steroids in the past. The left side is larger than the right. He has a moderate amount of excess skin.
>
> I explained to him in detail the ramifications of operative management in the form of suction assisted and direct excision through an inferior periareola incision. I also discussed the fact that he did have excess skin and that this could be corrected more completely with a crescent shaped excision in a superior areola excision but that would require a radial incision medially and laterally. I discussed with him the anticip[a]ted results and the difficulty in obtaining adequate reduction without excess concavity or excess skin for which would be fairly loose. I explained to him the fact that we could do this in a staged procedure and that we could try to maintain contour but it would be very likely there could be need for secondary procedures or even further reduction if this were unsatisfactory to him. I discussed with him th
> epossible [sic] complications of bleeding and infection and the need for reoperation. The automobile example is cited. The placement of the incision and the anticipated healing process is described including the need to limit his body activity. The need for postoperative compression is discussed. Potential for hypertrophy of the scars is discussed. The patient is referred to Dr. Craig Sussman for his evaluation to see if there is any nonsurgical management that can be carried out.

No such non-surgical treatment was determined to be of any value and on April 26, 1993, plaintiff returned to Dr. Buckspan. Following this consultation, Dr. Buckspan entered a clinical note as follows:

> Is seen in follow up consultation today. He has been evaluated by Dr. Craig Sussman and has no endocrinologic abnormalities. I discussed with him the methods of reconstructing his gynecomastia and at this time he elects to proceed with a transverse excision and free nipple grafting. He is aware of the potential loss of skin as well as the nipple areola grafts and the need for potential reconstruction. I also discussed and pointed out to him on his chest the extent of the incision and the fact that there could be widening, hypertrophy of the scars. He elects to proceed in the near future.

On this same day, April 26, 1993, following consultation with Dr. Buckspan, plaintiff signed what is designated as an "operative permit" containing, in pertinent part, the following:

> PLEASE READ THIS CAREFULLY AND FEEL FREE TO ASK ANY QUESTIONS YOU MAY HAVE ABOUT YOUR SURGERY OR THIS PERMIT.
>
> PATIENT_____*Don Harris*_____
> DATE OF SURGERY
>
> 1. I hereby request and authorize Dr. Glenn S. Buckspan and his associates to perform a surgical operation known as ___*Bilateral subcutaneous mastectomies with suction assistance and skin excision and free nipple grafting*___.
>
> 2. I further state that I have requested this surgery for the purpose of improving my function or appearance, or both.
>
> 3. The procedure listed above has been explained to me by Dr. Buckspan and his staff and I completely understand the nature of the procedure. The following points have been particularly stressed to me:_ *bleeding, swelling, infection, permanent scar, change in sensation, partial or complete loss of graft*__.
>
> 4. I recognize that during the course of the operation, unforeseen conditions may necessitate additional or different procedures than those set forth above. I therefore further authorize and request that Dr. Buckspan, his associates, or other physician whom Dr. Buckspan may request, perform such procedures as are, in Dr. Buckspan's professional

judgement, necessary and desir[e]able, including, but not limited to, procedures involving pathology and radiology. The authority granted under this paragraph four (4) shall extend to remedying conditions that are not known to Dr. Buckspan at the time the operation is commenced.

. . .

6. I am aware that the practice of medicine and surgery is not an exact science, and that I acknowledge that no guarantees have been made to me as to the results of the operation or procedure.

7. I acknowledge that you have warned me that my body or my skin, or my physical system could have a bad or disagreeable reaction to this procedure or anesthesia, including the following specific possible reactions, results, or side effects:
   _bleeding, swelling, infection, unfavorable scar_

8. I understand that the results obtained from this surgery depends in part on my following post operative instructions. I agree to cooperate with Dr. Buckspan and his staff in my follow up care until I have been completely discharged.

. . .

10. I have read this permit completely and fully understand it and I have had an opportunity to have answered any questions I may have about the permit and my surgery.

   DO NOT SIGN THIS PERMIT UNTIL YOU HAVE READ IT AND COMPLETELY UNDERSTAND THE CONTENTS.

   PATIENT SIGNATURE _x Donald G. Harris_ WITNESS _D Adamson_ DATE _4-26_

_____Surgery by Dr. Buckspan was scheduled at St. Thomas Hospital in Nashville on May 11, 1993. Prior to the administration of anesthesia on that date, plaintiff signed a document entitled "consent for surgical or invasive medical procedures" providing, in pertinent part, as follows:

   PATIENT:_____ _Donald Harris_____
   DATE:_____ _11 May 1993_____TIME:_____ _8:40_____
   A.M.
   I,_____ _Donald Harris_____, do hereby authorize
   Doctor_____ _Buckspan_____
   or one of his associates as follows:_____
   _____and such hospital personnel as he may designate
   and authorize to assist and to perform upon me the following procedure

-4-

and such post care and treatment as may be required for my best care. <u>*Bilateral subcutaneous mastectomies with suction assistance and skin excision and free nipple grafts*</u>.
The said operative procedure (or invasive medical procedure), its nature, complications and risks, and alternatives have been explained to me by my attending physician. My physician has not guaranteed any specific results from such contemplated procedure or surgery.

I recognize that during the course of the operation (or invasive medical procedure) unforeseen conditions may necessitate <u>additional</u> or different procedures than those set forth above. I therefore authorize the above physician, or persons he may designate, to perform such procedures as are, in his professional judgment, necessary and desirable. This authority is extended to remedying conditions that are not known by my physician at the time the operation (or invasive medical procedure) is commenced.

## <u>II.</u>      <u>Medical Battery</u>

This case was argued before this court on July 6, 1998, one week before the Supreme Court released its opinion in ***Blanchard v. Kellum***, No. 02-S-01-9709-CV-00083 (Tenn. 1998). In ***Blanchard,*** the Supreme Court recognized a distinction between an unauthorized procedure and a procedure authorized on less than adequate information to the patient.

Said the Supreme Court:

> We believe that there is a distinction between : (1) cases in which a doctor performs an unauthorized procedure; and (2) cases in which the procedure is authorized but the patient claims that the doctor failed to inform the patient of any or all the risks inherent in the procedure. Performance of an unauthorized procedure constitutes a medical battery. A simple inquiry can be used to determine whether a case constitutes a medical battery: (1) was the patient aware that the doctor was going to perform the procedure (i.e., did the patient know that the dentist was going to perform a root canal on a specified tooth or that the doctor was going to perform surgery on the specified knee?); and, if so (2) did the patient authorize performance of the procedure? A plaintiff's cause of action may be classified as a medical battery only when answers to either of the above questions are in the negative. If, however, answers to the above questions are affirmative and if the plaintiff is alleging that the doctor failed to inform of any or all risks or aspects associated with a procedure, the patient's cause of action rests on an informed consent theory.
>
> Informed consent cases require, by statute, expert

evidence to establish whether the information provided to the patient deviated from the usual and customary information given to patients to procure consent in similar situations. *See generally German v. Nichopoulos*, 577 S.W.2d 197 (Tenn. Ct. App. 1978) (holding expert evidence required to establish informed consent when patient knew of procedure to be performed but alleged that no risks associated with procedure were disclosed); see also Tenn. Code Ann. § 29-26-115, -118. The inquiry focuses on whether the doctor provided *any* or *adequate* information to allow a patient to formulate an intelligent and informed decision when authorizing or consenting to a procedure. *Shadrick v. Coker, M.D.*, 963 S.W.2d 726 (Tenn. 1998). To determine the adequacy of information provided in an informed consent case, a court must consider the nature of the medical treatment, extent of the risks involved and the applicable standard of care. Id.; Tenn. Code Ann. § 29-26-118. These determinations require expert testimony and are outside the common knowledge of a lay witness.

*Blanchard v. Kellum*, No. 02-S-01-9709-CV-00083, slip op. at 4-5 (Tenn. July 13, 1998). Footnotes omitted.

While the plaintiff at bar argues that the procedure by Dr. Buckspan was unauthorized, such argument does not withstand the "simple inquiry" of *Blanchard*. Plaintiff understood that Dr. Buckspan was going to operate on his chest in treatment of bilateral gynecomastia and Harris authorized the performance of the procedure. Thus, we are not dealing with "medical battery" under *Blanchard*, but with alleged lack of informed consent under Tennessee Code Annotated section 29-16-118.

Plaintiff admits that he knowingly executed both the "operative permit" dated April 26, 1993 and the "consent for surgical or invasive medical procedures" of May 11, 1993. He insists, however, that in his various consultations with Dr. Buckspan he was told that surgery could be performed that would reduce the size of his breasts and that such surgery would consist of two small incisions, one in the area of each breast and that tissue would be removed through these incisions. He claims he was further told that only a small hairline scar would remain; he was neither informed that an incision would be made across the entire breadth of his chest, nor told that he would undergo a "mastectomy" and "free nipple graft" where his nipples would be surgically

removed and then reimplanted. He further says he was never advised that the surgery would result in raised, red, rope-like hypertrophic scars or mispositioned and malformed nipples.

Plaintiff was not satisfied with the results of the procedure performed by Dr. Buckspan and sued alleging lack of informed consent and professional negligence.

III.      Informed Consent

The Supreme Court of Tennessee has held:

> "the plaintiff shall prove by evidence as required by § 29-26-115(b) that the defendant did not supply appropriate information to the patient in obtaining his informed consent (to the procedure out of which plaintiffs claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which he practices and in similar communities."

> Incorporating the common law controlling the effectiveness of consent, the statute explicitly requires as part of the plaintiff's burden of proof that the standard of care for obtaining informed consent must be shown by expert evidence in the same manner as provided in T.C.A. § 29-26-115(b). As stated in *Baldwin v. Knight*, 569 S.W.2d 450, 453 (Tenn. 1978), T.C.A. § 29-26-115(b) "adds . . . to the present case law requirements relating to expert testimony, (1) the necessity that a medical expert be licensed in this state or a contiguous bordering state; (2) the relevant specialty requirement; and (3) judicial discretion to waive those requirements upon a showing of the unavailability of such witnesses." Where a person has the capacity to consent, consent may not be effective because the person was not sufficiently aware of the extent of the risks or the nature of the treatment involved.

> "Counsel insists that simply because plaintiff testified that no one told her of any possible risks prior to receiving the injection, a *prima facie* case based on lack of informed consent was made out. . . . [I]n matters of informed consent the plaintiff has the burden of proving by expert medical evidence, (a) what a reasonable medical

-7-

> practitioner of the same or similar communities under the same or similar circumstances would have disclosed to the patient about attendant risks incident to a proposed diagnosis or treatment and (b) that the defendant departed from the norm."
>
> *German v. Nichopoulos*, 577 S.W.2d 197, 204 (Tenn. App. 1978), *cert. denied* (Tenn. 1979).

**Cardwell v. Bechtol**, 724 S.W.2d 739, 750 (Tenn. 1987).

Plaintiff insists that he is entitled to rely on oral assurances allegedly given him by Dr. Buckspan and that such right of reliance is not subsumed into the consent forms that he admittedly signed. This assertion is not disputed by the defendant but there is no expert testimony in the record establishing that breach of such alleged oral representations violated the applicable standard of care. Plaintiff's expert witness, Dr. Joseph Bussey, testified that the standard of care for informed consent " requires that the patient fully understand the procedure that's recommended and the various procedures that could satisfy the needs of that patient and the risks and complications related to those procedures and that the patient is accepting of those conditions before he would agree to have the procedure performed."

The expert testimony offered does not establish "(a) what a reasonable medical practitioner of the same or similar communities under the same or similar circumstances would have disclosed to the patient about attendant risks incident to a diagnosis or treatment and (b) that the defendant departed from the norm." *German v. Nichopoulos*, 577 S.W.2d 197, 204 (Tenn. App. 1978).

The lay assertions of Plaintiff as to oral representations and assurances made to him by Dr. Buckspan taken as being true can not make a jury question without the expert testimony required by Tennessee Code Annotated section 29-26-118.

The trial court correctly directed a verdict for the defendant on informed consent.

IV.     Professional Negligence

Just as Tennessee Code Annotated section 29-26-118 mandates expert testimony to establish the recognized standard of acceptable professional practice and the breach of such standard by the physician in order to make a *prima facie* case of inadequacy of consent, so section 29-26-115 requires such expert testimony in a malpractice action.

This statute requires:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a)(1980).

Plaintiff recognized this statutory requirement inasmuch as he procured the testimony of Dr. Joseph Bussey. However, while Dr. Bussey opines that Dr. Buckspan violated the applicable standard of care in the performance of the procedure he used in surgically treating Plaintiff's gynecomastia, it is clear when considering Dr. Bussey's testimony as a whole that this opinion is insufficient to establish a *prima facie* case for submission to the jury. Dr. Bussey testifies as follows:

> Q.     Doctor, are you familiar in this case with the type of procedure that was performed on Donald Harris? Are you familiar with the recognized standard of acceptable professional practice in plastic and reconstructive surgery as it applies to the treatment of gynecomastia?
> A.     Yes, sir.
> Q.     Doctor, have you formed an opinion as to whether the defendant complied with the recognized standard of acceptable professional practice in the field of plastic and reconstructive surgery in his treatment of Don Harris for

gynecomastia?

A.     Yes, I have.

Q.     What is that opinion?

A.     That it was not complied with. The standard of care wasn't met, because there are so many procedures that could be used that would be less disfiguring than the one actually recommended and performed on Mr. Harris.

Q.     Doctor, if you would, explain to the jury what the standard of care -- you've heard that term. Explain to the jury what standard of care means as applies in this case to plastic and reconstructive surgeries.

A.     Standard of care applies to the standard that reasonable physicians under like and similar circumstances would apply when selecting a procedure that they knew technically how to perform and that applied to the particular situation at hand and being certain the patient understood that procedure as well as the alternative procedures and then perform the procedure again within the standard of care, meaning in the fashion similarly trained and experienced physicians would take care of their patient.

. . .

Q.     Now, tell me a little bit about your opinion in this case. You mentioned that you thought the standard of care -- you told us what you thought the standard of care was in this case. Tell us in specifics how the defendant fell below the recognized standard of care in his treatment of Mr. Harris.

A.     It's my opinion that the deficiency in meeting the standard of care in this case were primarily related to the type of procedure that was selected for treatment, and that's based on looking at the pictures pre and post-op and having the opportunity to examine the patient and his twin brother and the pathology report, which clearly indicates that almost all of the tissue that was removed was fatty tissue, as opposed to glandular tissue, and the fact that there are and were in 1993 procedures available, which would be equally easy to perform, perhaps a lot easier to perform, and would not be so disfiguring for Mr. Harris.

Specifically that would be either liposuction alone or liposuction with, if necessary, the type of nipple incision that I was diagramming [sic] and the surgical removal of the glandular tissue beneath the nipple areolar complex, as opposed to what, at least in my opinion, was essentially a cancer operation, where you remove the entire breast and have to remove the excess skin and create flaps and do the free nipple transfer grafting.

Q.     Doctor, let me ask you again within a reasonable degree of medical certainty, as a result of the treatment that Don Harris received at the hands of Dr. Buckspan, did he suffer damages and injuries that he would not have otherwise suffered but for Dr. Buckspan's actions?

A.     He certainly suffered some very extensive

scarring and some appearance that the nipple areolar complex differs in size and location from where it was originally. Essentially that's the damages to him personally that instead of improving his appearance it is much worse than it was before he had the surgery.

Thus, it appears from the testimony of Dr. Bussey that it is Dr. Buckspan's choice of procedure in preference to other available procedures that apparently violated the applicable standard of care.

On cross examination, however, Dr. Bussey testifies:

Q.	Using as what you define as the standard of acceptable professional practice in this community, did Dr. Buckspan's decision to send this man to see Dr. Craig Sussman comply with the standard of care?

A.	Yes, he referred him for endocrinological evaluation for possible medical treatment.

Q.	Wasn't that a good thing to do that complied with the standards of care?

A.	Yes.

Q.	Isn't it also your testimony -- perhaps the jury should know you gave the deposition in this case, you will recall, on August 13th, 1996 at your office in Austell, didn't you?

A.	Yes, I did.

Q.	Isn't it also your testimony in your opinion that assuming the patient listened you have no criticisms of the operative consent form at all, isn't that right?

A.	I don't remember the exact phrase I used, but I don't see how listen comports with the written consent form.

Q.	It's your use of the language. I can ask it this way and we can refer back to the deposition if we want to. Isn't it true, Doctor, that this consent form itself is the kind of consent form that passes without criticism among surgeons complying with accepted standards of professional practice?

A.	The written consent form is indeed that.

Q.	Did you look at the written consent form to see what kind of information was disclosed on the form itself?

A.	Yes.

Q.	So if the patient looked at the consent form, he would know that the surgery he was going to have -- carried with it the risk of bleeding, correct?

A.	Yes.

Q.	Swelling?

A.	Yes.

Q.	Infection?

A.	I am assuming those are correct. It's been a while since I read the document. I have no reason to dispute

that.

Q. Unfavorable scar?

A. I am assuming that's correct.

Q. Isn't that on there?

A. I think it is.

Q. Doesn't this gentleman have an unfavorable scar?

A. Yes.

Q. A permanent scar?

A. In my opinion they are more than likely permanent.

Q. Change in sensation?

A. Yes.

Q. Partial or complete loss of grafts?

A. Yes.

Q. All of those potential risks and complications were listed on the consent form signed by Mr. Harris two to three weeks before surgery, correct?

A. Yes.

Q. In addition, the same consent form describes a procedure as a bilateral subcutaneous mastectomy with suction assistance, skin excision and free nipple graft. That describes the procedure he underwent on May 11th, 1993, doesn't it?

A. Yes.

Q. Isn't it true, Dr. Bussey, that in terms of looking at the operative note, the procedure that Dr. Buckspan performed was an acceptable procedure for a correction of this patient's problem?

A. In looking at the operative note, it's a procedure that has been accepted as something that's reasonable for correction of gynecomastia depending on the volume and degree of tosis and the appropriate understanding of other procedures that could be performed with less disfigurement.

Q. Do you have to today qualify your answer just as you did, or can you answer it yes or no?

A. I don't have to qualify it. It has been accepted as a procedure that is appropriate for this diagnosis.


In summary on cross examination Dr. Bussey further testified:

Q. Isn't it true that the surgical procedure itself as described, the technical aspect of the surgical procedure, was properly carried out in accordance with accepted standards of care?

A. The surgical procedure itself it appeared from the operative record was carried out within the acceptable standards of care. That's correct.

Q. Let's see if we can recap then. We've got a surgeon, a plastic surgeon, who is board certified whose had enough experience in this community to know the standard

of care, correct?

A. Yes.

Q. Who complies with the standard of care in sending the patient on to see an endocrinologist, right?

A. That's correct.

Q. Who performs a procedure that is one of the accepted methods of addressing gynecomastia but not the one you would choose, right?

A. Not for this patient. That's correct.

Q. And technically performs the procedure in a fashion that complies with accepted standards of care, correct?

A. Yes.

It is not a departure from the applicable standard of care for a physician to use a procedure that is but one of several procedures recognized in the profession as adequate in the treatment of the plaintiff's condition. In *Blankenship v. Baptist Memorial Hospital*, this court observed:

> In *Snyder v. St. Louis Southwestern R. Co.*, 228 Mo. App. 626, 72 S.W.2d 504, 512, the court said on this question:
>
> "We have found no better statement of the rule of care required of a physician than in the case of *Bailey v. [St. Louis-San Francisco] R. Co.,* Mo. App., 296 S.W. 477, cited by plaintiff, where this court, speaking through Judge Cox, said:
>
> " 'Physicians and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine duty of a physician, but he must often use his own best judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence * * *, even though his judgment may prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken. [Citing cases].'"
>
> [6] And where there is a difference of opinion among physicians or surgeons with reference to the treatment to be given in a particular case, a physician will not be held liable for malpractice if he follows the course of treatment advocated by a considerable number of physicians of good standing in his community. It would not be competent for a court or jury in such a case to say that a physician who

followed either of said different methods of treatment was negligent.

***Blankenship v. Baptist Mem'l Hosp.***, 26 Tenn. App. 131, 143-44, 168 S.W.2d 491, 496 (1942); *see also* ***McPeak v. Vanderbilt Univ. Hosp.***, 33 Tenn. App. 76, 229 S.W.2d 150 (1950).

This rule is reiterated in Tennessee Pattern Instructions (civil) 3rd at section 6.14. (The pattern jury instruction presupposes a dispute in expert witness testimony which does not exist in this case.)

Dr. Buckspan, along with his two experts, Doctors DeLozier and Barton, testified that the procedure used by Dr. Buckspan complied with the applicable standard of care and that neither in choosing the particular procedure, nor in the execution of the same, did the conduct of Dr. Buckspan fall below the standard of care.

Taking the testimony of Dr. Bussey as a whole, he simply disagrees with the procedure used by Dr. Buckspan, while at the same time acknowledging that such procedure is a recognized method of treating gynecomastia and that the procedure was performed in a professionally acceptable manner. Thus it is that no expert testimony in the record establishes a *prima facie* case that Dr. Buckspan deviated from the applicable standard of care in his treatment of Plaintiff. The trial court correctly directed a verdict in favor of the defendant on the medical malpractice issue.

V.        Res ipsa Loquitur

Plaintiff relying on ***Underwood v. H. C. A. Health Servs. of Tennessee***, 892 S.W.2d 423 (Tenn. Ct. App. 1994), asserts the application of res ipsa loquitur.

Tennessee Code Annotated section 29-26-115(c) provides:

In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant. Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality

causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

Tenn. Code Ann. § 29-16-115(c)(1980).

*Underwood* involved an action by a hospital visitor for injuries sustained when the cover of a self-service ice dispenser in the hospital cafeteria fell on her. The trial court directed a verdict for the defendant which was affirmed by the court of appeals. The case had nothing to do with res ipsa loquitur in the context of a medical malpractice claim.

In this case there is no medical expert testimony establishing the negligence of Dr. Buckspan and no evidence of accident or injury caused by an instrumentality under the exclusive control of the defendant. This action is not one where a jury based upon their own common knowledge and observation can infer negligence.

"Since there are only some instances where a pleading of res ipsa loquitur is applicable in medical malpractice cases, the doctrine is not applicable and recovery cannot be had without medical proof that the negligence actually occurred; . . . " 61 Am.Jur. 2d *Physicians, Surgeons, etc.*, § 338, (1981). As observed by the Court of Civil Appeals of Texas:

> There are only very, very few instances where a pleading of res ipsa loquitur is applicable in medical malpractice cases. Where negligence is alleged against a doctor, it must be proved by expert medical testimony before the case can be developed. The doctrine of res ipsa loquitur is not applicable and recovery cannot be had without medical proof that the negligence actually occurred."

*Goodnight v. Phillips*, 418 S.W.2d 862, 868 (Tex. Civ. App. 1967).

The trial court correctly directed a verdict on res ipsa loquitur.

VI.     Other Issues

The remaining issues asserted by Plaintiff relate to damages and to the

admissibility of certain evidence. Having determined that the trial court was correct in directing a verdict for Defendant on all liability issues, it is not necessary to discuss damage issues although it might be well to point out that evidence offered by Defendant of prior use by Plaintiff of anabolic steroids was irrelevant to any issue before the court. It may have been a cause for the development of the condition for which Plaintiff sought medical assistance in the first place. It is neither cause in fact or proximate cause of any injury or loss suffered by Plaintiff. *See McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991).

Finally, Plaintiff claims that his constitutional right to a trial by jury was violated when the trial court acting under Rule 50.02 of the Tennessee Rules of Civil Procedure directed a verdict for the defendant after declaring a mistrial because the jury was unable to agree. Plaintiff relies primarily on a statement by the court of appeals from *Keith v. Norris*, 57 Tenn. App. 423, 419 S.W.2d 189 (1967), which has not been cited in any reported decision in the ensuing thirty-one years. Said the *Keith* court:

> [2] We take up next, on its merits, the question of whether the trial judge ruled correctly, when on defendant's motion for a new trial, he undertook to correct what he concluded had been an error, and granted defendant's motion for a directed verdict. The fact that the trial judge was enough doubtful about the matter to overrule the motion for directed verdict indicates to some extent, at least, that reasonable minds might differ as to whether or not such motion should be granted, and the subsequent fact that the jury to whom the case was submitted did in fact disagree, clearly indicates that reasonable minds did disagree.

*Id.* at 429, 192.

To attribute to this ill-advised statement from *Keith* the meaning asserted by the Plaintiff would effectively destroy Rule 50.02 in any case where a jury was unable to agree and a mis-trial thus made necessary. The pertinent portion of Rule 50.02 provides: "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion."

-16-

Such is precisely what happened at bar when the trial judge reserved action on the motions for a directed verdict filed by the defendant and submitted the case to the jury. At a separate hearing held after the mis-trial was declared the trial judge determined that the motion for a directed verdict was sound in law and granted same. This action was in conformity with correct procedure. *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977).

The judgment of the trial court is in all respects affirmed with costs assessed against appellant.


_____
                           WILLIAM B. CAIN, JUDGE


CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE, M.S.


_____
BEN H. CANTRELL, JUDGE