**CONTINENTAL BANKERS LIFE IN-SURANCE COMPANY OF THE SOUTH, INC., Appellee,**

v.

**James G. SIMMONS, Appellant.**

Court of Appeals of Tennessee, Western Section.

Aug. 31, 1977.

Certiorari Denied by Supreme Court Dec. 5, 1977.

George O. Benton, Jackson, for appellant.

Russell Rice, Jackson, for appellee.

NEARN, Judge.

Plaintiff, before it changed its name to Continental Bankers Life Insurance Company, was known as Peoples Protective Life

Insurance Company and is often referred to in the record as P.P.L.I. At the outset it must be recognized that Continental and P.P.L.I. are one in the same corporate entity. P.P.L.I. was one of several subsidiaries of, and controlled by the parent, Peoples Protective Corporation. Among the subsidiaries of the controlling corporation was a corporation known as Sugar Tree Resort, Inc. Well-nigh total identity of officers and directors prevailed among the three corporations.

Defendant Simmons was engaged in the general insurance business in Jackson, Tennessee and among his best customers was the Peoples Protective conglomerate.

In May of 1975 P.P.L.I. (now known as Continental) filed suit in the Chancery Court of Madison County against Simmons for a deficiency on a note executed by Simmons. The note was in the original amount of $87,500.00, dated November 9, 1973, and secured by real property in the Sugar Tree Resort area along the Tennessee River. The complaint charged that after allowing credit for the foreclosure sale, there remained a balance due of $42,138.87 for which judgment was sought plus accrued interest and a reasonable attorney's fee.

At this point a slight digression is required for an understanding of the matter. Prior to Simmons' execution of the before mentioned note, the Peoples Protective conglomerate had fallen upon or, probably more accurately, had caused itself to fall upon hard financial times. Subsequent to the signing of the note, financial conditions worsened and the parent corporation (Peoples Protective Corporation) found it necessary to transform its holdings to cash.[1] The Peoples Protective Life Insurance Company was probably the most financially appealing Tennessee holding of Peoples Protective Corporation. The parent corporation held all of the stock in P.P.L.I. This stock was sold to Joe Jack Merriman who, at the time of trial, was the majority stockholder of former P.P.L.I. This was not a sale of the assets of P.P.L.I., but simply a sale of stock by a controlling stockholder. Merriman changed the name of the corporation to Continental. Included among the assets of the corporation was the Simmons note now sued upon. Thus, it may be seen that Continental is not an innocent holder for value of a negotiable instrument. Continental (formerly P.P.L.I.) and Simmons are principals to the instrument and it has never been negotiated to a third party.

Defendant Simmons filed his answer and raised equitable defenses to the note. Among them was the charge that the transaction was a sham, conceived in fraud and that it suffered from a failure of consideration.

The Chancellor was of the opinion that the case should rest on legal principles alone and awarded judgment for the proven deficiency, plus interest, reasonable attorney's fees and costs.

Both sides to the controversy have appealed.

■ We will consider first the Assignment of Error of plaintiff Continental.

Since Continental was the successful litigant below, its appeal is in the nature of a deployment of reserve troops, that is, should its adversary be initially successful in its attack of the judgment below, the reserves are to be thrown into the breach. Additional facts necessary for consideration of Continental's appeal are that the late William H. Hall was the initial hearing Chancellor of this matter. A motion for summary judgment was filed by Continental. Chancellor Hall filed a "Memo Opinion" in which he stated his reasons for the granting of a summary judgment. Chancellor Hall died before a formal order could be signed. The succeeding Chancellor declined to enter an order based on the "Memo Opinion" and set the summary judgment motion for a rehearing whereupon he overruled the motion.

---

1. Eventually, Peoples Protective Corporation and its subsidiaries, save P.P.L.I., filed in bankruptcy.

Counsel for appellee insists that the "Memo Opinion" is actually an order sustaining the motion for summary judgment and the succeeding Chancellor was therefore without authority to reverse the prior Chancellor's holding. The issue is moot. The matter is now before this Court on a record completed from a hearing on all the facts of the case. The most that could be said is that we have too much record to decide whether there is any disputed material issue of fact. Under T.C.A. § 27–303 this is a *de novo* appeal and we have suffered no hindrance or impediment to our decision by the act of the succeeding Chancellor.

Continental's Assignment of Error is overruled.

We now consider the Simmons appeal.

P.P.L.I. held a mortgage on undeveloped resort lots owned by its sister subsidiary Sugar Tree. In early 1973 and 1974 Peoples Protective Corporation (the parent company) and Sugar Tree were financially pinched. Sugar Tree held a public auction and sold certain resort lots on which P.P.L.I. held the mortgage. The lots did not bring enough to pay off the mortgage. P.P.L.I. was therefore left with an outstanding and now unsecured, unpaid and uncollectible indebtedness upon its books. The end of 1973 was then approaching and P.P.L.I. was required by law to file a year-end statement with the State Department of Insurance. Somehow P.P.L.I. had to satisfy this unpaid debt of Sugar Tree to avoid showing it as a non-admitted asset on the insurance report. Such adverse showing on the report would constitute an impairment of capital and result in a cease and desist order from the Insurance Commissioner.

The clear brief of counsel for Continental sets forth the virtually undisputed facts honestly and succinctly. With little addition thereto we set forth those facts as found in the brief.

The then officers of P.P.L.I. persuaded defendant Simmons to join them in a scheme whereby (1) Sugar Tree Resort, Inc. would deed to Simmons eleven of the remaining lots in the Sugar Tree Resort area; (2) Simmons would then borrow from P.P.L.I. $87,500.00 giving a trust deed on the eleven lots referred to; (3) Simmons gave to Sugar Tree Resort, Inc. a three year option to repurchase the eleven lots at the same price they were "sold" to Simmons; (4) Simmons then paid $87,500.00 to Sugar Tree Resort, Inc. as purchase price for the eleven lots; (5) Sugar Tree Resort, Inc. then paid to P.P.L.I. the sum of $71,500.00 for which payment P.P.L.I. released its note and mortgage on the property already auctioned off by Sugar Tree Resort, Inc.

The method of handling had the following results: (a) James G. Simmons wound up as owner of the fee of the eleven lots deeded to him which he continued to own until foreclosed by P.P.L.I.; (b) Sugar Tree Resort, Inc. was enabled to extricate itself from the predicament of having sold mortgaged property; (c) P.P.L.I. paid out $87,500.00 cash which unquestionably would be an admitted asset; (d) P.P.L.I. received back from Sugar Tree Resort, Inc. payment of $71,500.00 for which it surrendered its note and trust deed of Sugar Tree Resort, Inc. on the property already auctioned off by Sugar Tree Resort, Inc.; (e) P.P.L.I. wound up with the note and trust deed of Simmons for $87,500.00 which on the face of it would be an admitted asset while, if the loan had been direct to Sugar Tree Resort, Inc., it would be a non-admitted asset; (f) Simmons, by participating in this arrangement, helped keep a large customer in existence and in business by thus "pulling the wool" over the eyes of the Tennessee Department of Insurance.

Now we must part from counsel for Continental's brief; for while we commend him upon the form of his brief and the manner in which a rather complicated scheme (evidently based upon the philosophy that the ends justify the means) has been reduced to understandable terms, we must differ with both counsel for appellant and the Chancellor on the law to be applied to those facts.

As may now be seen, these Machiavellian machinations of P.P.L.I., Peoples Protective Corporation, Sugar Tree and Simmons were

conceived in fraud and hatched out in the heat of self interest and scheming illegality. As a corporation, Sugar Tree needed prompt relief from the precarious position of having sold mortgaged property. This relief could be obtained by paying off the mortgage. Neither Sugar Tree nor its parent corporation had the funds with which to supply that relief. P.P.L.I. was the most solvent of the conglomerate holdings. However, being an insurance company and subject to scrutiny by the Insurance Commissioner, it was in no position to make unsecured loans to Sugar Tree or to forgive the indebtedness and release the security. Simmons was then called in and matters explained to him. Because Simmons received a large portion of his insurance business from these enterprises, he agreed to the paper transaction as he was aware that he would profit from the continued existence of the Peoples Protective conglomerate. The effect of the "deal" was to inject Sugar Tree with a temporary financial transfusion from P.P.L.I. so as to obtain a release of the mortgages on the auctioned property, yet give Sugar Tree an opportunity to re-acquire the eleven lots at the price conveyed to Simmons. The *fait accompli* used Simmons as a willing straw man, or conduit, in order to hide the true undertaking from the Insurance Commissioner. A disclosure of the actual transaction would no doubt have ended in closing the doors of P.P.L.I.

What has happened is that the scheme went awry and now one conspirator[2] desires to use the Courts to collect from the other conspirator. The Court should not be so used.

We are of the opinion that the Chancellor erred in failing to apply equitable principles to the case. True, a suit on a note, even though filed in the Chancery Court, is not a matter of an inherently equitable nature and ordinarily equitable

principles would not be applied; but, when equitable defenses are raised by answer, the matter is transformed into an inherently equitable one. Had the suit been originally filed in the Circuit Court and equitable defenses raised, it could have been tried in the Circuit Court on equitable principles if no objection were raised, or else it could have been transferred to the Chancery Court for trial. See Gibson's Suits in Chancery, 5th Ed., § 36; T.C.A. § 16–511. Once defenses of an equitable nature are raised in the Chancery Court, even if the suit is one at law, applicable equitable principles will be the building blocks of the Court's decision.

This matter reaches us for a *de novo* review under T.C.A. § 27–303 and we will apply equitable principles.

The briefs argue pro and con on the application of the doctrine of estoppel. Numerous cases are cited to us where the doctrine of estoppel has or has not been applied to a party, e. g., *Molloy v. City of Chattanooga* (1950) 191 Tenn. 173, 232 S.W.2d 24 with Petition to Rehear at page 404; *McConnell v. McCleish and Thomas* (1929) 159 Tenn. 520, 19 S.W.2d 251; *Moore v. Carter* (1954 M.S.) 38 Tenn.App. 603, 277 S.W.2d 427; *Southern Railway Co. v. Lewis* (1917) 139 Tenn. 37, 201 S.W. 131. These cases are not in point, as they all deal with a one-sided phase of the doctrine, which is usually applied when one person is ignorant of the true facts and the other is not and the one who has superior knowledge causes the other to act on false information. When such is the case, the deceiving party, the one guilty of inequitable conduct, is said to be estopped to show the *true* facts.

There is another type of estoppel. A double barrelled variety. It is applied where both parties are guilty of inequitable conduct. When such is the case, both parties are estopped to show *any* facts upon

---

2. Again, we note that the stockholders and directors of Continental are not the same as those of P.P.L.I., but such fact in no way relieves the corporation, a separate entity, from its responsibility for its action made under previous directorship and under another name.

Once corporate existence has begun, even though, as here, the stockholders, directors, and corporate name may change, the corporation retains the same rights, liabilities, and responsibilities until dissolved.

which relief can be predicated. It is sometimes called the doctrine of "clean hands" and has been defined as:

> The principle is general, and is one of the maxims of the Court, that he who comes into a Court of Equity asking its interposition in his behalf, must come with clean hands; and if it appear from the case made by him, or by his adversary, that he has himself been guilty of unconscientious, inequitable, or immoral conduct, in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of, or depends upon, or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court. *C. F. Simmons Medicine Co. v. Mansfield Drug Co.* (1893) 93 Tenn. 84, 23 S.W. 165.

None of the parties to the fraud can have the assistance of the Court to compel either the enforcement or cancellation of the contract or to have property interests transferred thereunder restored. Equity will leave such parties where they have placed themselves, and will refuse all affirmative aid to either of the fraudulent parties. Gibson's Suits in Chancery, 5th Ed., § 51; *Parks v. McKamy* (1859) 40 Tenn. 297.

The facts of this case require the application of the doctrine with the result that the decree below is reversed and the complaint dismissed with costs below and on appeal assessed equally between the parties.

By designation of the Supreme Court of Tennessee, Honorable W. E. Quick, sitting for Presiding Judge C. S. Carney, and Honorable Joe C. Morris, sitting for Judge Kirby Matherne, took part in the hearing of this appeal.

Done at Jackson in the two hundred and second year of our Independence and in the one hundred and eighty-second year of our Statehood.

QUICK and MORRIS, Special Judges, concur.