IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 17, 2019 Session

IN RE MATTIE L.

**Appeal from the Chancery Court for Shelby County**
**No. CH-16-1899    Walter L. Evans, Judge**

_____

**No. W2018-02287-COA-R3-PT**

_____

Mother and Father had been divorced for less than two years when Mother and her new husband petitioned to terminate Father's parental rights. A few weeks before trial, Father was arrested, and he did not appear for the trial. In Father's absence, the chancery court concluded that two statutory grounds for termination had been proven by clear and convincing evidence: abandonment by willful failure to visit and abandonment by willful failure to support. The court also concluded that the evidence was clear and convincing that termination of Father's parental rights was in the child's best interest. As part of its analysis, the court applied the missing witness rule based on Father's failure to testify at trial. And the court applied the doctrine of unclean hands to "repel[] [Father] at the courthouse steps from receiving any relief that he has requested in this cause." We conclude that neither the missing witness rule nor the doctrine of unclean hands was applicable and that their application was fundamentally unfair to Father. We further conclude that the evidence of the two grounds for terminating Father's parental rights was less than clear and convincing. So we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Abigail D. Hall, Memphis, Tennessee, for the appellant, Christian L.

Mitzi C. Johnson, Collierville, Tennessee, for the appellees, Michael G. and Rebecca G.

Lisa A. Zacharias, Memphis, Tennessee, Guardian ad Litem.

# OPINION

## I.

### A.

Rebecca G. ("Mother") and Christian L. ("Father") married in June 2007. Their union produced one child, Mattie, born in January 2012. Mother and Father divorced just over three years later.

At the time of the divorce, Mother and Father lived with Mattie in Florida. The March 2015 Florida consent final judgment of dissolution of marriage incorporated a marital settlement agreement that provided for parenting arrangements. Mother and Father agreed that Mother would be the primary residential parent and that Father's parenting time would be supervised by his mother ("Grandmother"). Father also agreed that Mother would relocate with the child to Memphis, Tennessee. So the parenting plan provided that Father's visitation would take place in the vicinity of Mother's new residence on alternate weekends and in the summer commencing five days following the end of the school term and ending two weeks prior to the start of the new term. The parenting plan also allowed Father time during certain holidays and on the child's birthday. Based on the allotted parenting time, the court ordered Father to pay $503.91 a month in child support, as well as, half of Mattie's private school tuition, books, transportation, and other private school costs.

Following her relocation and within two months of the divorce, Mother met and moved in with Steven G. ("Stepfather"). Just five months after the divorce, Mother and Stepfather married. Within four months of marrying, Mother and Stepfather were discussing the possibility of Stepfather adopting Mattie.

In November 2015, Mother registered the Florida judgment of dissolution in Shelby County and petitioned to hold Father in civil contempt for failure to pay child support and to modify the parenting plan. *See* Tenn. Code Ann. §§ 36-5-2602, 36-6-229 (2017). In February 2016, the court held Father in civil contempt for failing to pay support and awarded Mother a judgment of $8,874.92. And the court ordered Father to pay Mother $715.91 per month for child support, arrearages, and health insurance by wage assignment. The court also modified the parenting plan. As modified, Father received parenting time, supervised by Grandmother, on the first and third weekend of every month. The holiday and birthday schedule remained the same.

The modified parenting plan and child support order proved to be no more workable than the first. Mother and Father soon found themselves back in court.

2

B.

On December 19, 2016, Stepfather, joined by Mother, petitioned to terminate Father's parental rights and for adoption. The petition alleged that Father had abandoned Mattie both by his willful failure to visit and by his willful failure to support.[1]

In late September 2018, as the trial date approached, Father was arrested. On October 5, 2018, while in court for a previously scheduled hearing, Father's counsel orally moved to continue the trial date, asserting Father's incarceration as grounds. But the court denied the request.

On October 15, the day of trial, Father was not present in the courtroom. When the court asked about Father's absence, his counsel responded:

> My client has an appearance before the criminal court this morning, Your Honor. He is currently in custody across the street and has an appearance. I have been in communication with his criminal defense attorney, have not gotten an actual answer as to what the status of what is going on over there this morning is.

Shortly thereafter, the following colloquy took place between the court and Father's counsel:

> THE COURT: Now, where did you say your client was incarcerated?
>
> [COUNSEL]: He is at the Shelby County Criminal Justice Center across the street.
>
> THE COURT: And what is the reason he is not produced today?
>
> [COUNSEL]: He has a hearing there, and they would not transport because he has an appearance before a judge . . . .
>
> . . . .
>
> THE COURT: Is he in a trial or just to make an appearance?

---

[1] The petition also alleged that Father "ha[d] failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the minor child[] and placing the child in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *See* Tenn. Code Ann. § 36-1-113(g)(14) (Supp. 2019). But Mother and Stepfather did not pursue this ground at trial.

[COUNSEL]: Just an appearance, and he should be done, I anticipate, relatively soon.

THE COURT: Soon, meaning today or tomorrow?

[COUNSEL]: That is my understanding, and I'm eagerly waiting any information to get him here.

Counsel did not renew her request for a continuance in light of Father's unavailability. Instead, counsel requested that the trial be "bifurcated," with the court only hearing evidence of the grounds for termination. As counsel explained:

I do believe we can begin, so long as we're limiting it to the petitioner's [sic] proof that their grounds exist by clear and convincing evidence that [Father] willfully failed to do the things they've alleged him doing. We can go ahead and get started on that, and if Your Honor finds that grounds don't exist, then it is not necessary to hear any proof about best interest or review any documents that might go to best interest or the other day's worth of testimony that we're going to sit through to determine what's in this child's best interest because we have to get over the hurdle of grounds first.

The court denied the request to bifurcate, and the trial proceeded.

On the second day of the trial, Father was still not present. When the court again asked about Father's absence and whether the trial could proceed without him, Father's counsel said "I'm here as his attorney of record, and I absolutely believe we can proceed without him." The trial proceeded that day and another four days thereafter.

The court terminated Father's parental rights. Its conclusions of law began with an analysis of the missing witness rule. Mother and Stepfather asserted the rule applied due to Father's failure to testify. The court agreed and held that there was a "presump[tion] that [Father's] testimony would have been unfavorable to him." The court then considered both of the statutory grounds asserted and concluded that the evidence was clear and convincing that Father had abandoned Mattie by the willful failure to visit and by the willful failure to pay child support.

In evaluating Mattie's best interest and the statutory factors, the court again applied the missing witness rule. Among the factors the court considered was whether a meaningful relationship had otherwise been established between Father and Mattie. *See* Tenn. Code Ann. § 36-1-113(i)(4) (Supp. 2019). Because Father had "failed to appear so that he could testify about his relationship with the minor child," the court "presumed that [Father's] testimony would be adverse to his case." After evaluating all the applicable

4

statutory best interest factors, the court concluded that "it [wa]s clearly in the best interest of Mattie . . . that the parental rights of [Father] be terminated."

As a final point, the court decided that Father was "guilty of unclean hands." The court found that some of Father's answers to Mother's and Stepfather's interrogatories were false. As a consequence, the court determined that Father "should be repelled at the courthouse steps from receiving any relief that he has requested in this cause."

## II.

A parent has a fundamental right, "protected by the Due Process Clauses of the federal and state constitutions," to the care and custody of his own child. *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). But parental rights are not absolute. *Id.* at 522; *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Our parental termination statute specifies circumstances in which the State's interest in the welfare of a child justifies interference with a parent's right to his child. *See* Tenn. Code Ann. § 36-1-113(g). Yet "when judicial proceedings are initiated to terminate parental rights, parents are constitutionally entitled to certain fundamentally fair procedures." *In re Gabriella D.*, 531 S.W.3d 662, 680-81 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 522).

### A.

We first consider two rulings by the trial court that had implications for the fundamental fairness of the trial: the application of the missing witness rule, along with the "presumption that [Father's] testimony would have been unfavorable to him," and the doctrine of unclean hands.

1.      Missing Witness Rule

As our supreme court has explained,

> Under the missing witness rule, a party is entitled to argue, and *have the jury instructed*, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions.

*State v. Middlebrooks*, 840 S.W.2d 317, 334 (Tenn. 1992) (emphasis added) (citing *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984)). Application of the missing witness rule requires evidence "show[ing] that the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for the trial." *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979). The anticipated

testimony must not be "merely cumulative," *Francis*, 669 S.W.2d at 89, and the uncalled witness "must [also] not have been equally available to both parties." *State v. Boyd*, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992). The party invoking the rule has the burden of establishing the necessary elements. *See State v. Thompson*, 768 S.W.2d 239, 250 (Tenn. 1989).

Even assuming for the sake of argument that Mother and Stepfather established the necessary elements, the missing witness rule was not applicable here. There was no jury. This Court has stated, on more than one occasion, that the rule does not apply to bench trials. *Beacon4, LLC v. I & L Invs., LLC*, 514 S.W.3d 153, 185 (Tenn. Ct. App. 2016) ("[Party] appears to be asking this Court to apply the missing witness rule to this bench trial, which we determine to be inapplicable."); *see also Nelson v. Justice*, No E2017-00895-COA-R3-CV, 2019 WL 337040, at *19 (Tenn. Ct. App. Jan. 25, 2019) ("Father fails to explain how this rule applies to a bench trial like the one here.") *perm. app. denied*, (Tenn. Sept. 18, 2019); *In re Estate of Hamilton*, No. M2009-01882-COA-R3-CV, 2011 WL 532296, at *6 (Tenn. Ct. App. Feb. 14, 2011) ("[T]he missing witness and missing evidence rule applies to jury trials where the trial judge instructs the jury how to interpret the evidence or lack thereof, and [the appellant] does not explain how this rule can apply to a bench-tried case such as this.").

Additionally, the missing "witness" was a party.[2] Generally, "a defendant in a civil case is not required to testify and has the right to rely upon the duty of the plaintiff to carry the burden of proof and to avail himself of the plaintiff's failure to make out a case." *Runnells v. Rogers*, 596 S.W.2d 87, 90 (Tenn. 1980). With a party, similar to the missing witness rule, the court may make unfavorable inferences as a result of the party's failure to testify. *Id.* But "[a]n adverse inference . . . does not supply *proof* of any particular fact; rather, it may be used only to *weigh* facts already in evidence." *In re Samantha C.*, 847 A.2d 883, 899 (Conn. 2004); *see also Runnells*, 596 S.W.2d at 90 (The adverse inference "applies, however, only 'when the plaintiff's proof and the legal deduction therefrom make a prima facie case against the defendant.'" (quoting *Davis v. Newsome Auto Tire and Vulcanizing Co.*, 213 S.W. 914, 915 (Tenn. 1919))).

Based on the language used in the order, it does not appear the court merely applied an adverse inference to weigh the facts in evidence. Instead the court appears to have presumed the existence of evidence based on Father's failure to testify.

---

[2] "[D]ue process require[d] the trial court to provide the prisoner defendant with meaningful access to the court and an opportunity to be heard." *In re Perry*, No. W2000-00209-COA-R3-CV, 2001 WL 277988, at *5 (Tenn. Ct. App. Mar. 12, 2001); *see also* Tenn. Code Ann. § 36-1-113(f)(3) (requiring proof that an incarcerated parent has been advised of his "right to participate in the hearing and contest the allegation that the rights of the incarcerated parent . . . should be terminated"). On appeal, Father does not claim that he was denied access to the court or an opportunity to be heard.

2.      Doctrine of Unclean Hands

The doctrine of unclean hands is a maxim of equity. *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007); Henry R. Gibson, *Gibson's Suits in Chancery*, § 2.09 (William H. Inman ed., 8th ed. 2004). The doctrine "is based on the principles that he who seeks equity must do equity and that he who has done inequity cannot have equity." *In re Estate of Boote*, 265 S.W.3d at 417. "[I]t provides the court with a basis to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims." *Id.* (footnote omitted); *Continental Bankers Life Ins. Co. v. Simmons*, 561 S.W.2d 460, 465 (Tenn. Ct. App. 1977). The doctrine "applies to him who affirmatively seeks equitable relief." *City of Columbus v. Mercantile Tr. & Deposit Co. of Baltimore*, 218 U.S. 645, 662 (1910). So the doctrine would have no application to a defendant not asserting a counter or cross-claim. *See* 30A C.J.S. Equity § 105, Westlaw (database updated March 2020).

To the extent that a parental termination and stepparent adoption may be considered an action in equity,[3] the unclean hands doctrine had no application to Father. Only Mother and Stepfather were seeking relief. Thus Father should not have been, in the words of the court, "repelled at the courthouse steps from receiving any relief that he has requested in this cause." Far from being repelled at the courthouse steps, Father had a constitutional right to be there. *See In re Perry*, No. W2000-00209-COA-R3-CV, 2001 WL 277988, at *5 (Tenn. Ct. App. Mar. 12, 2001).

We conclude that the trial lacked fundamental fairness based on the court's application of the missing witness rule and the doctrine of unclean hands. Neither the rule nor the doctrine was applicable. And their application undermined the protections to which Father was entitled by virtue of the liberty interest at stake. *See In re Gabriella D.*, 531 S.W.3d at 680-81; *In re Carrington H.*, 483 S.W.3d at 521; *In re Angela E.*, 303 S.W.3d at 250.

---

[3] We have considered the possible application of the unclean hands doctrine in at least two cases involving minors. *Bulick v. Thompson*, W2004-00816-COA-R3-CV, 2005 WL 123502, *4 (Tenn. Ct. App. Jan. 18, 2005) (parental relocation); *Haynes v. Haynes*, 904 S.W.2d 118, 120 (Tenn. Ct. App. 1995) (modification of custody). And there may be historical precedent for treating cases involving minors as an equity action. *See Ex parte Badger*, 226 S.W. 936, 938 (Mo. 1920) ("[T]he protection of infants, even from their parents . . . constitutes one of the well-established grounds for the exercise of equity jurisdiction in the protection of personal rights."). Ultimately, in our prior cases, we concluded that "'unclean hands' *does not necessarily* repel a petition regarding the welfare of a child which predominates over any offended dignity of the court." *Haynes*, 904 S.W.2d at 120 (emphasis added); *see also Bulick*, 2005 WL 123502, at *4 (quoting the same passage from *Haynes*).

7

B.

Although we have determined that the trial lacked the fundamental fairness required by the Due Process Clauses of the federal and state constitutions and that alone supports reversal, we still must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest." *In re Carrington H.*, 483 S.W.3d at 525.

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 544 (Tenn. 2015). Parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. A "trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law." *In re Carrington H.*, 483 S.W.3d at 524. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The parental termination statutes give alternative definitions for "abandonment." *Id.* § 36-1-102(1)(A) (2017). At the time Mother and Stepfather petitioned for termination, "abandonment" included "the willful failure to visit, to support, or to make reasonable payments toward the support of the

8

child during the four-month period preceding the filing of the petition to terminate parental rights."[4] *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing Tenn. Code Ann. § 36-1-102(1)(A)(i)). Mother and Stepfather alleged, and the court concluded, that Father had abandoned Mattie by the willful failure to visit and to support.

Because of the definition of abandonment at the time the petition was filed, the court had to conclude that Father's abandonment of Mattie was willful. The failure to visit or support alone was insufficient to establish abandonment for purposes of terminating parental rights. While the failure of the parent to visit or support presents a question of fact, "[w]hether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

1.      Willful Failure to Support

We are concerned with Father's support of and visits with Mattie during the four-month period from August 19, 2016, to December 18, 2016. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period). The evidence does not preponderate against the finding that Father failed to pay child support during the relevant period. So we focus our review on whether the failure to support was willful.

A willfulness determination must take into account the parent's financial ability, or capacity, to pay support. *In re Mackenzie N.*, No. M2013-02805-COA-R3-PT, 2014 WL 6735151, at *6 (Tenn. Ct. App. Nov. 26, 2014). Capacity is evaluated, in part, by considering the parent's income or sources of support prior to the filing of the petition to terminate. *See In re Adoption of Angela E.*, 402 S.W.3d at 641. Here, the record includes little evidence of Father's income during the relevant time period. Mother testified that Father worked for American Airlines, Federal Express, Prime Flight Aviation, and Home Depot during various points between February and December 2016. Yet evidence provided by the employers showed that Father only worked for Federal Express a few days in early 2016 and that Father was terminated by Prime Flight in May 2016. Mother also testified that Father was employed doing odd jobs, but she could not recall a time frame.

---

[4] Effective July 1, 2018, petitioners no longer have to prove a parent's failure to support or to visit was willful. 2018 Tenn. Pub. Acts 1088. Under the current version of the statute, the parent or guardian must raise, and bears the burden of proof on, the defense of "absence of willfulness." Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019).

The record does include Father's account statements at a bank and a credit union. At the bank, Father's September-October 2016 statement showed a beginning balance of $21.22, with $188.00 in deposits and $209.11 in debits, and an ending balance of $.11. His October-November and November-December statements showed no activity. His December-January statement showed a beginning a balance of $.11. After a refund of $21.94 and debits of $21.93, the account balance as of January 10, 2017, was $.12. For the credit union, Father started with an account balance of $5.69 as of July 1, 2016 and ended with an account balance of $5.71 as of December 31, 2016. The only activity in the account was a credit union dividend of 2 cents.

On this record, we cannot conclude that the evidence was clear and convincing that Father's failure to support was willful. Mother and Stepfather failed to establish that Father had the capacity to pay child support during the relevant four-month period. *See In re B.L.*, No. M2003-01877-COA-R3-PT, 2004 WL 2451355, at *10 (Tenn. Ct. App. Nov. 1, 2004) (holding DCS did not meet its burden of establishing willfulness when the record contained insufficient evidence of mother's basic living expenses and the consistency of her work). Father's responses to interrogatories showed monthly living expenses of just less than $1,000, but we find evidence of only nominal income during the four-month period preceding the filing of the termination petition.

2.     Willful Failure to Visit

The modified parenting plan granted Father parenting time, supervised by Grandmother, on the first and third weekend of every month. He also received parenting time at certain holidays and on Mattie's birthday, if the birthday fell on a date that Father was regularly scheduled to exercise visitation. In the months leading up to the filing of the petition to terminate parental rights, the already contentious relationship between Mother and Father only grew more so, in part, due to Father's failure to pay child support. On August 1, 2016, Mother e-mailed Father asking if he would be in Memphis that weekend and if he would have $1,000 to give her. She told him that, if he had no money, then he would not see Mattie. Father responded that he was in intensive alcohol treatment.

Father's treatment did not last long; he was discharged after only three days. On August 17, 2016, Mother and Father began an e-mail exchange regarding his upcoming visitation on that Friday. On August 19, Mother wrote,

> If you don't have $1000, she won't be dropped off today. You refuse to give me job information, an address where you currently reside, or any answer regarding any financial obligations. So don't get surprised when I don't leave her tonight. If you can bring $1000 OWED TO US, she can stay. Otherwise, use your weekend to work so that you can start paying off

10

your debt with me.  Understand?

After Father claimed that he could not get the money to Mother, she responded,

> No money, no kid.  Sorry.  You don't pay anything and it's time somebody
> holds you accountable for your actions.
>
>     . . . .
>
> Any further contact from you this weekend will be considered harassment.
> I will not respond.
>
>     . . . .
>
> I'm not kidding.  We aren't coming tonight since you choose once again,
> despite many warnings, to NOT PAY.

On August 23, 2016, Mother offered to let Father have Mattie if he would bring $1,000 cash or cashier's check.  After August 23, Mother did not respond to any further emails from Father.  Father continued to email Mother about visitation in September, October, and December.

When Mother stopped responding to Father's emails, their primary means of direct communication was cutoff.  Mother often blocked Father's cellphone number "for a few days" when she was angry with him.  And Mother refused to provide Father her address because she feared for her safety.  After she had cutoff direct communication, Mother expected Father to deal with Stepfather about visitation.

Visitation exchanges were to take place at a police precinct where Stepfather worked.  Stepfather testified that Father never showed up for an exchange during the four-month period preceding the filing of the petition to terminate.  But neither did Mother or Mattie.  According to Stepfather,

> [B]ecause Mattie was rather upset at the fact that she had to go visit with
> [Father] and [Grandmother], so I was -- with his sporadic showing up, I just
> told [Mother], I said: Just hold tight here, have her ready, and then I'll go
> check, because I was already at work so I would hang out there and see that
> he didn't show up.  And when he didn't show up, I would meet [Mother
> and Mattie] for dinner.

Stepfather also testified that he was aware of the vehicle Father drove.  But he was not asked if he knew Grandmother's vehicle or looked for her.

11

Where a parent attempts to visit his child but is obstructed by the acts of another, his failure to visit is not "willful" within the meaning of the statute. *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A parent's attempts at visitation are obstructed where another person's conduct creates "a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d at 864. As such, the failure to visit is only willful if it is a "product of free will, rather than coercion." *Id.* at 863.

Considering the entire record, the evidence was not clear and convincing that Father's failure to visit was willful. In addition to cutting off direct communication and not appearing for exchanges, Mother took other steps to limit Father's access to Mattie such as telling Mattie's school that Father was violent and dangerous. At trial, Mother admitted that she was withholding visitation because she was frustrated and fed up with all Father had put her through.[5]

C.

All parties have requested attorney's fees on appeal. Under the "American rule," which is followed in Tennessee and most other jurisdictions, "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).

Father cites no authority for an award of attorney's fees. He only states that it is in this Court's discretion to award attorney's fees on appeal. We decline to award attorney's fees to a party that cannot identify a contractual, statutory, or some other basis for such an award.

Unlike Father, Mother and Stepfather identify two bases for an award of attorney's fees. They claim an award is authorized under Tennessee Code Annotated § 36-5-103(c). At the time the petition for termination was filed, the statute permitted an award of attorney's fees "incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child."[6] *See* Tenn. Code Ann. § 36-5-103(c)(2017). We have previously held that Tennessee Code Annotated § 36-5-103(c) does not apply to parental termination cases. *See In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *21 (Tenn. Ct. App. June 17, 2015); *In re Nathaniel C.T.*, 447 S.W.3d 244, 247 (Tenn. Ct.

---

[5] Because we conclude that neither statutory ground for terminating parental rights was proven by clear and convincing evidence, we do not reach the issue of whether termination was in Mattie's best interest.

[6] Subsection (c) of Tennessee Code Annotated § 36-5-103 was amended in 2018. The amended version applies to actions commenced on or after July 1, 2018. 2018 Tenn. Pub. Acts 1186.

App. 2014); *Bryant v. Bryant*, No. 01A01-9806-CV-00337, 1999 WL 43282, at *6 (Tenn. Ct. App. Feb. 1, 1999). We see no reason to depart from our prior precedent.

Stepfather and Mother also assert that Father's appeal is frivolous. Under Tennessee Code Annotated § 27-1-122 (2000), an appellate court may award damages, including attorney's fees, against an appellant if an appeal is frivolous or taken solely for delay. A "frivolous" appeal is one that is devoid of merit, has little prospect of success, or is lacking in justiciable issues. *See Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977) (citing the predecessor to Tennessee Code Annotated § 27-1-122). This appeal is not frivolous.

## III.

Because he was deprived of fundamentally fair procedures, we reverse the termination of Father's parental rights to Mattie. We also conclude that the evidence was less than clear and convincing that Father abandoned his child by the willful failure to visit or the willful failure to support. We remand the case for such proceedings as may be necessary and consistent with this opinion.[7]

_____
W. NEAL McBRAYER, JUDGE

---

[7] Although we restore Father's parental rights, our decision does not preclude Mother from seeking to further restrict Father's parenting time based on the developments that occurred after the filing of the petition to terminate. Our decision also does not preclude Stepfather from the filing of a new petition to terminate Father's parental rights.