FILED

02/05/2021

Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
November 5, 2020 Session[1]

## IN RE MATTIE L.

**Appeal by Permission from the Court of Appeals
Chancery Court for Shelby County
No. CH-16-1899    Walter L. Evans, Chancellor**

———————————————————

**No. W2018-02287-SC-R11-PT**

———————————————————

In this parental termination case, we review the trial court's application of the missing witness rule to a party in a non-jury trial, the trial court's reliance on the doctrine of unclean hands, and whether the trial court erred in terminating parental rights on the grounds of abandonment. A mother and stepfather petitioned the trial court to terminate a father's parental rights and allow the stepfather to adopt the child. The trial court terminated the father's parental rights based on a finding of abandonment by willful failure to support, willful failure to make reasonable or consistent support payments, and willful failure to visit. The trial court also found termination was in the child's best interest. In reaching these conclusions, the trial court presumed that because the father—a missing witness— did not appear for trial, his testimony would have been unfavorable to him. In addition, the trial court ruled that under the doctrine of unclean hands, the father should be "repelled at the courthouse steps" because he made false statements in his interrogatory answers. The Court of Appeals reversed, finding the trial court erred by applying the missing witness rule in a non-jury trial and by applying the doctrine of unclean hands. The Court of Appeals also held the mother and stepfather's evidence of abandonment was less than clear and convincing. We hold: (1) the missing witness rule may apply in a non-jury trial, although here the trial court misapplied the rule; (2) the trial court erred in applying the doctrine of unclean hands to the father because he was defending against a petition for statutory relief while seeking no equitable relief, and his alleged misconduct was collateral to the issue of abandonment; and (3) the evidence of abandonment was not clear and convincing. Thus, we hold the trial court erred in terminating the father's parental rights. We reverse the judgment of the trial court and dismiss the petition to terminate the father's parental rights.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Affirmed in Part and Reversed in Part; Judgment of the Trial Court Reversed**

---

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Mitzi C. Johnson and Brent A. Rose, Collierville, Tennessee, for the appellants, Michael G. and Rebecca G.

Abigail D. Hall and Elizabeth W. Fyke, Memphis, Tennessee, for the appellee, Christian L.

Lisa Zacharias, Memphis, Tennessee, Guardian Ad Litem for Mattie L. (at trial).

**OPINION**

**I.**

Mattie L., the daughter of Rebecca G. ("Mother") and Christian L. ("Father"), was born in January 2012. Three years after Mattie's birth, Mother and Father's eight-year marriage ended in a divorce granted by a Florida trial court. Under Mother and Father's agreed parenting plan and time-share schedule, Mattie would spend the majority of her time with Mother. Father would have time-sharing with Mattie on alternate weekends near Mother's home, alternate designated holidays, and during most of Mattie's summer vacation. Father's time would be temporarily supervised by his mother until Mother and Father could agree that supervision was no longer necessary. Father was to pay Mother child support in the amount of $503.91 per month, half of Mattie's noncovered medical bills, and half of her private school tuition and expenses. Father was also to provide health and dental insurance coverage for Mattie as long as the coverage was reasonably available to him.

In March 2015, soon after the divorce was granted, Mother and Mattie moved to Memphis. They lived with Mother's family for a few months before moving in with Mother's boyfriend, and now-husband, Michael G. ("Stepfather"). About four months after Mother and Stepfather married in August 2015, they began discussing Stepfather adopting Mattie.

Father fell behind on his support obligations, and in November 2015, Mother registered the Florida divorce judgment in the Shelby County Circuit Court and petitioned the court to modify the parenting plan and time-share schedule. Mother also petitioned the court to hold Father in civil contempt for failure to pay child support and other obligations. In February 2016, the court issued an order, holding Father in civil contempt and awarding Mother a judgment of $8,874.92 for child support, school expenses, and insurance arrearages. The court also issued a wage assignment and ordered Father to pay Mother $715.91 each month for child support, arrearages, and health insurance. In addition, the

court changed Father's supervised parenting time from alternate weekends to the first and third weekends of each month and made no change to Father's holiday and summer visitation times.

In December 2016, Mother and Stepfather petitioned the Shelby County Chancery Court to terminate Father's parental rights and allow Stepfather to adopt Mattie. The petition alleged that Father had abandoned Mattie by willfully failing to visit her, willfully failing to support her, and willfully failing to make reasonable or consistent payments toward her support during the four consecutive months before the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017) (amended 2018).[2] Father denied the allegations.

Ten days before trial, the trial court denied Father's request to delay the case because he was in the Shelby County jail. When the trial began on October 15, 2018, Father's attorney explained that Father was unable to appear in court because he had to also appear in Shelby County Criminal Court. Father's attorney did not request another continuance but moved the trial court to bifurcate the hearing into two phases: first, grounds for termination, and second, a best interest determination. The trial court denied the request, and the trial proceeded in Father's absence. On the second day of trial, the trial court asked Father's counsel if the trial could go forward without Father. Father's attorney agreed saying, "I'm here as his attorney of record, and I absolutely believe we can proceed without him."

The six-day trial proceeded in Father's absence. On the abandonment issue, Mother and Stepfather presented the testimony of Mother, Stepfather, Mother's mother and stepfather, the principal and two business office employees from Mattie's former school, a real estate agent, the records custodian of a facility where Father had received treatment

---

[2] The statute in effect when the petition was filed in 2016 provides:

> For purposes of terminating the parental . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either [has] willfully failed to visit or [has] willfully failed to support or [has] willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017) (amended 2018).

The Legislature amended the statute effective July 1, 2018, and the current version places the burden on the defendant to plead as an affirmative defense that the failure to visit or support was not willful and to establish the lack of willfulness by a preponderance of the evidence. *See* 2018 Tenn. Pub. Acts, ch. 875, § 2 (codified as amended at Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2020).

for alcohol addiction, and the records custodian for one of Father's employers. Father presented the testimony of his mother and his sister. Mother's calendars with notes about Father's visitation, Mattie's school registration forms, Mother's and Father's emails and text messages, and Father's military records, bank records, employment records, 2016 Internal Revenue Service Form W-2, and interrogatory answers were introduced into evidence. The parties' discovery depositions were filed with the trial court.

At the close of proof, the trial court granted Mother and Stepfather's request to apply the missing witness rule and presume that Father's testimony, if he had appeared, would have been unfavorable to him. The trial court also granted Mother and Stepfather's request to apply the equitable doctrine of unclean hands and not allow Father to obtain any relief because he had been untruthful under oath during discovery about his 2005 military service and his 2016 treatment for alcohol addiction.[3] After applying the unclean hands doctrine, the trial court found Father "should be repelled at the courthouse steps from receiving any relief that he ha[d] requested in this cause."

On November 30, 2018, the trial court issued an order finding by clear and convincing evidence that Father's parental rights should be terminated "due to his willful abandonment of [Mattie] in his failure to visit and failure to pay child support." The trial court also held termination was in Mattie's best interest.[4]

The Court of Appeals reversed, finding the trial court erred by applying the missing witness rule in a non-jury trial and by relying on the doctrine of unclean hands. The Court of Appeals also held the evidence on the grounds of abandonment was less than clear and

---

[3] Father stated in his interrogatory answers that he served in the Marine Corps from January 2005 through August 2006 and that he had a "medical separation" resulting from a training injury. Father's military records, however, showed he enlisted in the Marine Corps in February 2005, began active duty in May 2005, and was discharged in June 2005 for failure to disclose his history of alcoholic pancreatitis. Father also stated in his interrogatory answers that he was in an alcohol detox facility in Kentucky for five days in June 2016 with a diagnosis of alcohol dependence. In addition, Father stated he had received treatment for alcohol abuse and anxiety at a facility in Memphis where he completed one week of inpatient treatment and three weeks of "intensive outpatient treatment." Father's medical records, however, showed he received inpatient treatment at the Memphis facility from August 2, 2016, to August 5, 2016. On August 8, 2016, he entered the intensive outpatient treatment program and left a week later after not complying with the treatment summary and goals and violating the attendance policy.

[4] This case was pending in the trial court nearly twenty-three months before being heard. The trial court failed to comply with Tennessee Code Annotated section 36-1-124(a), which requires in all contested termination of parental rights cases that "the trial court shall, consistent with due process, expedite the contested termination or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6." Tenn. Code Ann. § 36-1-124(a) (2017 & Supp. 2020).

- 4 -

convincing.[5] *In re Mattie L.*, No. W2018-02287-COA-R3-PT, 2020 WL 1867372 (Tenn. Ct. App. Apr. 14, 2020), *perm. app. granted* (Tenn. Aug. 11, 2020).

This Court granted Mother and Stepfather's application for permission to appeal. We review the trial court's decision to apply the missing witness rule, the trial court's reliance on the doctrine of unclean hands, and whether the trial court erred in terminating Father's parental rights on the grounds of abandonment.

## II.

### *Standard of Review*

"A parent's right to the care and custody of [the parent's] child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). This constitutional right may be taken away only through "fundamentally fair procedures," including "a heightened standard of proof—clear and convincing evidence." *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky v. Kramer*, 455 U.S. 745, 754, 769 (1982)). Clear and convincing evidence is proof which "establishes that the truth of the facts asserted is highly probable[] and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* (quoting *In re Audrey S.*, 182 S.W.3d at 861). This standard of proof "ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d at 522. The requirement of clear and convincing evidence "minimizes the risk of an erroneous decision" in a case with the profound consequences of terminating parental rights. *In re Keri C.*, 384 S.W.3d at 744 (citing *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998)).

Under Tennessee Rule of Appellate Procedure 13(d), this Court reviews the trial court's findings of fact in a proceeding involving termination of parental rights "de novo with a presumption of correctness, unless the evidence preponderates otherwise." *In re Gabriella D.*, 531 S.W.3d at 680 (citing *In re Carrington H.*, 483 S.W.3d at 524). We review the trial court's determination about whether the facts constitute clear and convincing evidence to support termination of parental rights de novo with no presumption of correctness because that determination is a conclusion of law. *Id.* "Because of the gravity

---

[5] The Court of Appeals' finding that Mother and Stepfather had not proven abandonment by clear and convincing evidence pretermitted the issue of whether termination of Father's parental rights was in Mattie's best interest. This issue is not before this Court.

of their consequences, proceedings to terminate parental rights require individualized decision making." *In re Audrey S.*, 182 S.W.3d at 861 (citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)).

*The Missing Witness Rule*

We begin with our review of the trial court's application of the missing witness rule to Father who did not appear at trial. After the trial court denied Father's pretrial motion for continuance, Father's counsel advised the trial court the case could proceed in Father's absence. At the request of Mother and Stepfather, the trial court applied the missing witness rule after finding that Father was available to testify. Although in jail across the street from the courthouse, Father was available by subpoena. The trial court then "presumed that [Father's] testimony would have been unfavorable to him." The Court of Appeals reversed, holding that the missing witness rule applied in jury proceedings, not bench trials. Both courts misapplied the missing witness rule.

Tennessee's law of evidence recognizes the common law rule that a party "may comment upon the failure . . . to call an available and material witness whose testimony would ordinarily be expected to favor" the opposing party. *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984). The missing witness rule may apply when the evidence shows that a witness who was not called to testify knew about material facts, had a relationship with the party "that would naturally incline the witness to favor the party," and the witness was available to the process of the court. *Id.* (quoting *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979)). In civil trials, this rule applies when the missing witness is also a party—with knowledge of material facts, naturally favorable testimony, and availability to judicial process. *See Runnells v. Rogers*, 596 S.W.2d 87, 90–91 (Tenn. 1980); *W. Union Tel. Co. v. Lamb*, 203 S.W. 752, 753 (Tenn. 1918).

The logic of this common law principle stems from the commonsense inference that "[a] party's intentional efforts to keep evidence from the fact-finder" is reasonably "interpreted as an implied admission of weakness in that party's case." Robert H. Stier, Jr., *Revisiting the Missing Witness Inference—Quieting the Loud Voice from the Empty Chair*, 44 Md. L. Rev. 137, 140 (1985). This "inference, which Wigmore calls 'one of the simplest in human experience,'" *id.* (quoting 2 John Wigmore, *Evidence in Trials at Common Law* § 278, at 133 (J. Chadbourne rev. ed. 1979)), is well-grounded in Tennessee law. Yet we have applied it with due caution for the "several dangers inherent" in its operation, such as adding false weight or significance to testimony that a court has not heard. *See Francis*, 669 S.W.2d at 89. Thus, we strictly construe the missing witness rule and its elements. *Id.*

We hold that the missing witness rule may apply in both jury and non-jury trials. The essence of the rule is that the trier of fact, whether it be a jury or a judge, may make a permissible inference from a party's failure to testify. The confusion about the rule's

application may arise because most often the rule operates through a set of proper jury instructions.

The Court of Appeals was not without authority in holding the missing witness rule did not apply, relying on *In re Estate of Hamilton*, No. M2009-01882-COA-R3-CV, 2011 WL 532296 (Tenn. Ct. App. Feb. 14, 2011), *perm. app. denied* (Tenn. May 25, 2011); *Beacon4, LLC v. I & L Investments, LLC*, 514 S.W.3d 153 (Tenn. Ct. App. 2016); and *Nelson v. Justice*, No. E2017-00895-COA-R3-CV, 2019 WL 337040 (Tenn. Ct. App. Jan. 25, 2019), *perm. app. denied* (Tenn. Sept. 18, 2019). In *Hamilton*, the Court of Appeals stated that the missing witness rule applies to jury trials but noted that the party asserting the rule failed to explain how it could apply in a bench trial. 2011 WL 532296, at \*6. In *Beacon4*, the Court of Appeals, citing *Hamilton*, determined that the missing witness rule did not apply in a bench trial. 514 S.W.3d at 185. Similarly, in *Nelson*, the Court of Appeals emphasized that the party invoking the rule did not "explain how" it "applies to a bench trial." 2019 WL 337040, at \*19. These Court of Appeals cases are overruled to the extent they hold that the missing witness rule does not apply in a non-jury trial.

The trial court erred in its application of the missing witness rule by applying a presumption against Father rather than a permissive inference. While a presumption tilts the scales of legal reasoning toward a particular result, a permissive inference merely enables the trier of fact to draw on logical leaps that are ordinary to our shared experience. In *Francis*, after enumerating the rule's elements, we emphasized that it is best and "now generally characterized as authorizing a permissive inference," rather than a "presumption." 669 S.W.2d at 88. Importantly, a plaintiff cannot use the inference to avoid the burden of establishing a prima facie case for the plaintiff's claims. *See Runnells*, 596 S.W.2d at 90 (observing that a defendant need not testify and may avail himself of the plaintiff's failure to carry the burden of proof and that the missing witness rule "applies . . . only 'when the plaintiff's proof and the legal deduction therefrom make a prima facie case against the defendant'" (quoting *Davis v. Newsome Auto Tire & Vulcanizing Co.*, 213 S.W. 914, 915 (Tenn. 1919))). Nor can the inference "amount to substantive evidence of a fact of which no other evidence is introduced." *McReynolds v. Cherokee Ins. Co.*, 815 S.W.2d 208, 210 (Tenn. Ct. App. 1991); *see also* 2 Kenneth S. Broun, et al. *McCormick On Evidence* § 264 (Robert P. Mosteller ed., 8th ed. 2020), Westlaw (database updated January 2020) ("[U]nlike the usual presumption, it is not directed to any specific presumed fact or facts which are required or permitted to be found. The burden of producing evidence of a fact cannot be met by relying on this 'presumption.'").

The missing witness rule carries no more legal force than the commonsense inference it permits the trier of fact to apply in weighing the evidence. But the inference is not substantive proof and does not relieve a party of the burden of proving a prima facie case. *In re Estate of Price*, 273 S.W.3d 113, 140 (Tenn. Ct. App. 2008) (quoting *Arnett v. Fuston*, 378 S.W.2d 425, 428 (Tenn. Ct. App. 1963)).

Thus, in a non-jury trial, a trial court should not apply the missing witness rule in a mechanical or conclusory fashion to replace evidence. Instead, the court should carefully consider the commonsense inference that withheld testimony is likely unfavorable when the court weighs other available evidence. The missing witness rule alone does not resolve any issue.

Father's purported testimony facially satisfies the *Francis* elements. He likely knew material facts about the grounds for termination; he was naturally inclined to oppose termination of his parental rights; and although in jail, Father was available to judicial process for at least some portion of the trial through a subpoena or request to transfer his custody to the trial court. But the trial court applied the missing witness rule too broadly. It hardly stands to reason, for example, that Father's testimony about his willingness to care for his child would have been unfavorable, especially given his repeated efforts to exercise his visitation rights during the relevant four-month period. Not only did the trial court mischaracterize the rule as creating a sweeping presumption rather than a permissive inference, the trial court also failed to explain how it applied this inference in determining any particular fact. When the trial court serves as trier of fact, it should explicitly integrate the inference created by the missing witness rule into its findings for the rule to work. In sum, the trial court erred by presuming that Father's entire testimony would have been unfavorable to him.

*The Doctrine of Unclean Hands*

We now turn to the trial court's reliance on the equitable maxim of unclean hands, which provides that "he who comes into a court of equity, asking its interposition in his behalf, must come with clean hands." *C.F. Simmons Med. Co. v. Mansfield Drug Co.*, 23 S.W. 165, 168 (Tenn. 1893); *see also Thomas v. Hedges*, 183 S.W.2d 14, 16 (Tenn. Ct. App. 1944) (quoting Henry R. Gibson, *Gibson's Suits in Chancery* § 42 (4th ed. 1937)). This maxim protects the integrity of the court, ensuring that any claimant whose requested "relief grows out of or depends upon or is inseparably connected with his own prior fraud . . . will be repelled at the threshold of the court." *Fuller v. Cmty. Nat'l Bank*, No. E2018-02023-COA-R3-CV, 2020 WL 1485696 at *5 (Tenn. Ct. App. Mar. 27, 2020), (emphasis omitted) (quoting *Simmons*, 23 S.W. at 168), *perm. app. denied* (Tenn. Aug. 6, 2020); *see also Hogue v. Kroger Co.*, 373 S.W.2d 714, 716 (Tenn. 1962); Henry R. Gibson, *Gibson's Suits in Chancery* § 2.09 (William H. Inman ed., 8th ed. 2004).

The trial court applied the maxim and ordered that Father "should be repelled at the courthouse steps from receiving any relief that he ha[d] requested" because Father had made several misrepresentations in sworn answers to interrogatories about his military service and treatment for alcohol dependency.

We hold that the trial court erred by applying the doctrine of unclean hands. The doctrine applies only to parties who seek an equitable remedy from a court. Mother and

Stepfather petitioned the trial court for statutory relief under Tennessee Code Annotated section 36-1-113. Father was in court only to defend against Mother and Stepfather's petition for statutory relief—he sought no equitable relief. Thus, the doctrine of unclean hands does not apply to Father. To compound its error, the trial court relied on Father's conduct that was collateral to the abandonment issue. The doctrine of unclean hands is limited to "misconduct connected with *the particular matter* in litigation; and does not extend to any misconduct, however gross, which is unconnected therewith, and with which [the opposing party] is not concerned." *Chappell v. Dawson*, 308 S.W.2d 420, 421 (Tenn. 1957) (emphasis added) (quoting Henry R. Gibson & John Alexander Chambliss, *Gibson's Suits in Chancery* § 42 (3d ed. 1929)); *see also In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007) (holding that the doctrine "provides the court with a basis to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts *with regard to the subject matter of their claims*" (emphasis added) (footnote omitted)). Alleged misrepresentations in sworn answers relate to the litigation as a whole, and we do not condone such misrepresentations. Even though Father's misrepresentations about his military service and his course of addiction treatment are troubling, they are not material to whether Father had abandoned his child. In sum, the trial court erred in applying the doctrine of unclean hands.

*Abandonment by Willful Failure to Support*

We now review the trial court's finding of abandonment by willful failure to support and willful failure to make reasonable or consistent support payments. The statute defines "willful[] fail[ure] to support" or "willful[] fail[ure] to make reasonable payments toward [the] child's support" as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments[6] toward the support of the child[.]" Tenn. Code Ann. § 36-1-102(1)(D). Failure to support is willful when a parent is aware of the duty to support and has the ability but makes no attempt to provide support and has no justifiable excuse for failure to do so. *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013); *In re Keri C.*, 384 S.W.3d at 745 (quoting *In re J.G.H., Jr.*, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *15 (Tenn. Ct. App. Aug. 17, 2009)).

A termination of parental rights cannot be based on a failure to pay support unless the court finds by clear and convincing evidence that the failure was willful. *See In re Addalyne S.*, 556 S.W.3d 774, 787 (Tenn. Ct. App. 2018); *In re Keri C.*, 384 S.W.3d at 746. This Court concluded in *In re Adoption of Angela E.* that the petitioners had not established by clear and convincing evidence the father had paid only "token support" because "[t]he evidence concerning Father's income and expenses [was] limited at best." 402 S.W.3d at 641; *see also In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007

---

[6] "Token support" is support that, "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

WL 3171034, at *7 (Tenn. Ct. App. Oct. 30, 2007) (finding no clear and convincing evidence of willful failure to support because there was no evidence of the father's income); *In re M.J.B.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004) (holding that the Department of Children's Services failed to prove a mother's willful failure to support when the evidence showed the mother had held a few "unskilled, low paying jobs for brief periods of time," but she lacked "any disposable resources that she could have used to support her children").

If a parent is not financially able to provide support, the parent's failure to support is not willful. *In re Audrey S.*, 182 S.W.3d at 864 n.33 (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Pierce v. Bechtold*, 448 S.W.2d 425, 429 (Tenn. Ct. App. 1969)); *see also In re Laura F.*, No. M2017-01767-COA-R3-PT, 2019 WL 1896560, at *7 (Tenn. Ct. App. Apr. 29, 2019) (citing *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014)). Willful unemployment can be construed as a willful failure to support. *In re Francis R.*, No. M2018-00613-COA-R3-PT, 2018 WL 5307887, at *6 (Tenn. Ct. App. Oct. 25, 2018) (citing *In re Austin D.*, No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11–12 (Tenn. Ct. App. Jan. 30, 2013)), *perm. app. denied* (Tenn. Dec. 13, 2018); *see also, e.g.*, *In re Laura F.*, 2019 WL 1896560, at *7 (finding willful unemployment where the mother told her sister that "she did not want to work because she did not want to pay child support"); *In re Maddox G.*, No. W2018-01115-COA-R3-PT, 2019 WL 927062, at *5 (Tenn. Ct. App. Feb. 25, 2019) (finding it was not enough for the petitioners "to simply assert that Father was unemployed during the relevant four-month period and assume that he was capable of working and paying child support"); *In re Keri C.*, 384 S.W.3d at 747 (finding clear and convincing evidence of willful failure to support when the mother was employed for part of the relevant four-month period and could have paid some support but paid none).

Mother and Stepfather had the burden of proving willful failure to support by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1) (2017 & Supp. 2020); *In re Addalyne S.*, 556 S.W.3d at 789 (citing *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *8–9 (Tenn. Ct. App. Mar. 12, 2015)). Our focus is on the four-month period before the filing of the petition—August 19, 2016, to December 18, 2016. Father paid no child support during this time, so the only issue is whether his failure to pay was willful.

Mother and Stepfather presented no wage statements or other evidence of Father's employment between August 19, 2016, and December 18, 2016. Mother testified that between February and December 2016, Father worked at "American Airlines, FedEx, PrimeFlight Aviation, Home Depot, several jobs just for a few weeks or months at a time." But when asked about the time from August to December 2016, Mother testified that Father told her he was working. Yet Mother's testimony, corroborated by the testimony of other

witnesses, showed that Father had been untruthful at times.[7] Mother testified she believed Father was "an able-bodied individual and he was able to hold down a job . . . during that time period."[8] But Mother and Father had a strained relationship and had little to no personal contact from August to December 2016.

Emails from Father to Mother during the four-month period do not support Mother's assertion that Father was working during that time. Rather, the emails suggest Father was in treatment for alcohol addiction in August and was working in September and October:

> August 19, 2016, Father wrote: "I'm on leave from work so I can do the full [alcohol addiction] treatment program."

> August 25, 2016, Father wrote: "I don't have $1000 cash to give you until I'm back to work. FMLA pay while I'm in rehab just isn't enough."

> September 13, 2016, Father wrote: "I will come up with all the money I can, I am just back to working after [FMLA] and rehab."

> October 10, 2016, Father wrote: "I get paid Friday and your cut will come from it . . . ."

Yet these email statements contradict Father's responses to interrogatories in which he stated under oath that he was unemployed during the relevant time but did odd jobs such as landscaping from time to time and received some financial support from his family. Father's 2016 Internal Revenue Service Form W-2 showed he earned $7,069.50 working for PrimeFlight Aviation Services, Inc. Father had no reported income after May 2016 when he left his job with PrimeFlight. Father testified in his August 2017 deposition that he had been unemployed for "almost a year"[9] before his current job at Home Depot.

Father's lack of employment and income is supported by his bank and credit union records. Father's banking records from August to December 2016 show minimal funds and

---

[7] Mother testified that during their marriage, Father was untruthful to her about his military service. A real estate agent testified Father told her in July 2016 he was prequalified for a substantial home mortgage, was a commercial pilot, and had four children and multiple ex-wives—none of which was true. The principal and two business office employees from Mattie's former school testified Father told them he was a pilot for FedEx. One of Father's former co-workers testified Father got out of work once by claiming Mattie needed surgery—when she did not.

[8] Father's sister testified Father was "physically fit" and able to work but admitted she did not know much about his employment history and had seen him perhaps once between August and December 2016.

[9] Father's answers to interrogatories show he was unemployed for just over a year—from May 2016 to June 2017—which encompasses the four-month period at issue.

no regular income. His checking account statements for September, October, and November 2016 each shows an ending balance of $0.11; the December 2016 statement shows an ending balance of $0.12. Similarly, Father's credit union account statement for July to September 2016 shows an ending balance of $5.70; the statement for October to December 31, 2016, shows an ending balance of $5.71.

Father's minimal income from August to December 2016 is consistent with his income from the time of the divorce in 2015 to August 2016. His interrogatory answers show, other than PrimeFlight from December 2015 to May 2016, Father's only employment was a $12-an-hour job at U.S. Airways from July to November 2015. Father's bank records also suggest Father had minimal income from February through May 2016.[10]

Mother testified she believed Father was able-bodied and capable of working, although Mother had limited contact with Father from August to December 2016. The trial court noted no evidence showed Father was unable to seek or retain employment. Father, however, did not have to prove he was unable to work because it was Mother and Stepfather's burden to prove he was able but unwilling to work. Mother and Stepfather presented no proof Father had refused to look for a job or was willfully unemployed during the relevant time.

The trial court also found Father had the ability to work and that there was no proof as to the reason he could not pay child support. Yet Father received inpatient and outpatient treatment for alcohol abuse for part of August 2016. There was no evidence he was able to work from August to December 2016. In addition, Father's bank records do not reflect a financial ability to provide support. Although a few of Father's emails to Mother during the four months before the filing of the petition suggest he was working, his sworn responses to interrogatories, his deposition testimony, and his tax records show he was unemployed. Nor did the proof show Father had any kind of regular income during the relevant time. His bank records suggest he had no regular income from August to December 2016. Although Father estimated in his deposition he made $13,000 or $14,000 in 2016, the only documentation of his income from that year is the Internal Revenue Service Form W-2 showing he made $7,069.50. The evidence preponderates against the trial court's ruling that Father had the ability to work and pay support.

To meet their statutory burden, Mother and Stepfather needed to present evidence about Father's employment, assets, income, and expenses during the relevant four-month period. *In re Francis R.*, 2018 WL 5307887, at *5. Even though it "need not be an accounting of every dollar earned and spent," Mother and Stepfather had to show by clear

---

[10] Father's bank records from February through May 2016 also show limited funds. The February statement has an ending balance of $229.14; the March statement shows an ending balance of $711.81; the April statement has an ending balance of $5.80; the May statement shows an ending balance of $0.28.

and convincing evidence that Father "had the capacity to pay support, did not do so, and had no justification for not doing so." *Id.* (quoting *In re Preston L.*, No. M2016-02338-COA-R3-PT, 2017 WL 4315356, at *5 (Tenn. Ct. App. Sept. 27, 2017)). Mother's belief, without more, that Father was able-bodied and capable of working from August to December 2016 is not enough to prove it is "highly probable" or to "eliminate any serious or substantial doubt" that Father was willfully unemployed or could provide support. In sum, Mother and Stepfather failed to prove by clear and convincing evidence that Father willfully failed to pay support.

*Abandonment by Willful Failure to Visit*

The remaining ground for termination is Father's alleged willful failure to visit between August 19, 2016, and December 18, 2016. Tennessee Code Annotated section 36-1-102(1)(E) defines willful failure to visit as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation."[11] Failure to visit is willful when a parent is aware of the duty to visit, can visit, and with no justifiable excuse makes no attempt to visit. *In re Keri C.*, 384 S.W.3d at 745 (quoting *In re J.G.H., Jr.*, 2009 WL 2502003, at *15 (Tenn. Ct. App. Aug. 17, 2009)). Father had court-ordered visitation on alternate weekends and some holidays, including Christmas 2016. Father did not visit Mattie during the relevant four-month period. Thus, we only need to determine whether Father's failure to exercise his parenting time was willful.

There was conflicting testimony about whether Father tried to exercise his parenting time with Mattie. Stepfather testified that Father did not pick Mattie up on any of his weekends from August to December 2016 at the exchange location, a police precinct where Stepfather worked. Stepfather admitted that Mattie was not present on Father's exchange days, but Stepfather would show up alone at the exchange location to see if Father was there.

Father, however, testified in his deposition that he went to the exchange location on the first and third Fridays of each month during the four-month period, only to find Mother and Stepfather were not there. Father's answers to interrogatories similarly state that beginning in August 2016, Mother refused to meet Father and exchange Mattie for visitation. Father's mother, who supervised Father's visitation, testified that at times Mother and Stepfather were not present at the exchange location—"more than once and for a period of time frequently." Mother testified if Father had been there, she "most definitely" would have allowed him to visit with Mattie. Mother's emails to Father, however, contradict her testimony. Mother admitted that in the spring of 2016, she was not

---

[11] "Token visitation" is defined as visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

cooperating with visitation because she was frustrated with Father for his conduct during their marriage and for his failure to pay child support. Mother's response was to deny visitation. Mother's emails from August to December 2016 show that by then she had overtly taken the position of "no money—no kid."

Emails between Mother and Father about visitation on the weekend of August 19, 2016, confirm that Father would have no visitation if he did not pay child support:

August 18, 2016, at 6:17 p.m., Mother wrote: "**Anyway, will you have money this weekend? If not, visitation is off.** I'm not kidding. You're in a pretty deep financial hole and I'm going to get that money out of you, one way or another." (Emphasis added).

August 19, 2016, at 2:16 p.m., Mother wrote: "If you don't have $1000, she won't be dropped off today. . . . **If you can bring $1000 OWED TO US, she can stay**. Otherwise, use your weekend to work so that you can start paying off your debt with me. Understand?" (Emphasis added).

August 19, 2016, at 2:34 p.m., Father wrote: "Just be there at 6. You will have your money this weekend. You can't keep holding our child captive to money."

August 19, 2016, at 2:48 p.m., Mother wrote: "And **if I don't have money AT 6PM, she will not be left tonight**. . . . You will never really be involved in her life. Fine with me!!!!" (Emphasis added).

August 19, 2016, at 3:44 p.m., Father wrote: "There is no way I can get $1000 by [6:00 p.m.]."

August 19, 2016, at 3:53 p.m., Mother wrote: "**No money, no kid.** Sorry. . . . I'm not kidding. **We aren't coming tonight since you choose once again, despite many warnings, to NOT PAY**." (Emphasis added).

August 19, 2016, at 4:12 p.m., Father wrote: "So every weekend you don't show up is just as bad as every payment I don't make. I want to see my little girl Rebecca. Please stop playing games about this[.]"

August 19, 2016, at 4:14 p.m., Mother wrote: "**Don't bother showing up if you can't pay**. . . . Again, **we will not be there so don't bother showing up**. I warned you, **no money, no kid**." (Emphasis added).

On August 23, 2016, Mother emailed Father and offered to let him have time with Mattie during the upcoming weekend, but "[t]he only catch is, I need $1000 before I will

give her to you." Again, Father did not have the money Mother demanded. Father explained, "I would be absolutely delighted to see [Mattie] and spend time with her. As I had explained previously, I don't have $1000 cash to give you until I'm back to work. . . . Thank you again for the offer . . . I miss [Mattie] more than you can imagine."

After that, Father's emails to Mother suggest that she stopped communicating with him:

September 13, 2016, at 3:01 p.m., Father wrote: "I really need to see my baby. Rebecca, I am begging on my hands and knees. I just want to see [Mattie]. . . . I need her hugs and want to see her so bad. Please work with me Rebecca."

September 29, 2016, at 8:03 p.m., Father wrote: "I still have heard nothing from you about me seeing [Mattie]. Please contact me, I've been trying for a couple weeks now. . . . I'll be in [Memphis] tomorrow thru Sunday night and I would really like to see my daughter. Thank you."

October 10, 2016, at 1:22 a.m., Father wrote: "So this coming up weekend is my weekend. What are your plans for [Mattie] as far as me getting to see her? I get paid Friday and your cut will come from it . . . . I just really want to see my daughter. . . . Rebecca, I miss my baby and really want to see her. Please respond to me this time."

October 13, 2016, at 12:40 p.m., Father wrote: "Can you please respond to me? We are going on many weeks of zero contact from you. I just want to see my daughter Rebecca."

December 14, 2016, at 4:12 p.m., Father wrote: "I am, for the hundredth time, trying to contact you. This coming up weekend is my weekend and Christmas is my holiday. I will be in town for both. I have no way to get a hold of you to which you actually respond. I have no idea where you moved or where to send anything to. Honestly, you have fallen off the face of the earth with my child. Please call, text, or email me back."

December 16, 2016, at 1:53 p.m., Father wrote: "Are you going to bring [Mattie] to meet me at 6 or not? I need to know so I don't keep going up there just for you not to show up."

December 19, 2016, at 7:40 p.m., the day Mother and Stepfather filed their petition in Chancery Court, Father wrote: "Please respond in some nature. I've texted, called, and emailed you for months and nothing. Christmas is my holiday this year and I will be in town."

- 15 -

Text messages from Father to Mother confirm that Mother withheld visitation and refused to communicate with Father:

September 2, 2016, Father wrote: "So I assume I don't get my court appointed time this weekend?"

December 16, 2016, Father wrote: "So are you going to respond to my emails and voicemails or just ignore my weekend again?"

December 25, 2016, Father wrote: "So another court appointed time with my child that you just ignore [because] you have other plans? Merry Christmas Rebecca."

Mother admitted that she refused to let Father see Mattie over the 2016 Christmas holiday. Even though it was Father's holiday under the parenting plan, Mother unilaterally decided it would have been "detrimental" for Mattie to visit with Father.

Mother's policy of "no money—no kid" is unacceptable. Failure to visit is not willful if it is the result of coercion. *In re Audrey S.*, 182 S.W.3d at 863. Father's lack of visitation from August to December 2016 resulted from coercion—Mother's refusal to allow visitation unless Father paid support. Failure to visit is not willful if another person's conduct prevents the parent from visiting or "amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child." *Id.* at 864. Such conduct includes "blocking [the parent's] access to the child," "keeping the child's whereabouts unknown," or "vigorously resisting a parent's efforts to visit the child." *Id.* at 864 n.34. Mother's emails show that she vigorously resisted Father's efforts to visit with Mattie, violated the court's order on visitation, and purposefully interfered with Father's efforts to develop a relationship with Mattie. Mother's refusal to respond to Father's emails and text messages is more evidence of her intention to thwart his visitation efforts. Mother admitted she refused to give Father the address where she and Stepfather lived with Mattie, she directed Mattie's school to deny Father access to Mattie, and sometimes she blocked Father's number on her phone so he could not call or send her text messages.

We find the evidence preponderates against the trial court's findings of fact that Father willfully failed to visit with Mattie. Evidence of Mother's efforts to interfere with Father's relationship and deny visitation precludes a "firm belief or conviction" that Father had the ability to visit, made no attempt to visit, and had no justifiable excuse for not visiting. *See In re Keri C.*, 384 S.W.3d at 744. Thus, Mother and Stepfather failed to meet their burden of proving willful failure to visit by clear and convincing evidence.

## III.

We hold the missing witness rule may apply in a non-jury case, but the trial court misapplied it here. We also hold the trial court erred in applying the doctrine of unclean hands when Father was not seeking equitable relief and because the misconduct was collateral to the abandonment issue. Finally, we hold Mother and Stepfather failed to provide clear and convincing evidence that Father abandoned Mattie by willful failure to support, willful failure to make reasonable or consistent support payments, and willful failure to visit. Thus, the trial court erred in terminating Father's parental rights on these grounds. We reverse the judgment of the trial court and dismiss Mother and Stepfather's petition to terminate Father's parental rights. We affirm the judgment of the Court of Appeals, with the exception of its holding on the missing witness rule. The costs of this appeal are taxed to Michael G. and Rebecca G., for which execution may issue if necessary.

_____

SHARON G. LEE, JUSTICE